STEPHEN HERRICK v. THE ESTATE OF SEWALL F. BELKNAP
AND THE VERMONT CENTRAL RAILROAD COMPANY.

[IN CHANCERY.]

*Provision in contract for railroad construction, that the engineer's
estimate shall be conclusive.   Jurisdiction of chancery in case of
mistake or fraud in the estimates.   Equitable claims not barred
if not presented to commissioners of deceased person's estates.
Practice.   Requisites of a report of a master in chancery upon
taking an account.*

A stipulation in a contract for the construction, in part, of a railroad, that " the engineer
shall be the sole judge of the quality and quantity of the work, and from his decision
there shall be no appeal," is binding upon the parties, and constitutes the engineer an
arbitrator or umpire between them.

Such a stipulation imposes upon the party, by whom the engineers are to be employed, the
duty of employing for such engineers, competent, upright and trustworthy persons, and
to see to it that they perform the service expected of them, at a proper time and in a
proper manner.

Such a stipulation, construed with reference to its subject matter, does not require the esti-
mates to be made or verified by the chief engineer, but has reference as well to the assist-
ant or resident engineer, by whom such estimates are usually made.

If payment for the work performed is dependent upon, and to be made according to the
engineers' estimates, as to its amount, and the employing party performs its duty in ref-
erence to the employment of suitable engineers, &c., the obligation to pay will not arise
until such estimates are made.

But if no estimates are made, through the neglect or fault of the engineer, or of the party
who employs him, the other party could probably recover at law, for the work peformed by
him, without any engineer's estimate of it.

A contract providing for monthly estimates of the contractor's work, according to which he
is to be paid, imports an accurate measurement and final estimate for each month, and not
such a one as is merely approximate or conjectural.

A court of equity has jurisdiction of a claim to be paid for a larger amount of work, done
under such a contract, than was estimated by the engineer, where the under estimate
was occasioned either by mistake or fraud.

The Vt. C. R. Co. contracted with B. for the construction of their railroad, and B. contrac-
ted with the orator for the construction of a part of it.   In both contracts there was such
a provision in reference to the conclusiveness of the engineer's estimates.   *Held*, that there
was no privity of contract between the orator and the Vt. C. R. Co., and that he could
not recover of them for work not estimated by the engineer, by reason only of a mistake,
which they had not either directly or indirectly caused or connived at; and that their
indebtedness to B. for the same work for which he was indebted to the orator did not con-
stitute a fund against which the orator had a claim.

44

Herrick *v.* Belknap's Est. and The Vt. Cent. R. Co.

But if there was any connivance on the part of the Vt. C. R. Co., or their agents in bringing about the under-estimates complained of, even if it was without the design ultimately to defraud but only as a temporary expedient for present relief, the orator would be entitled to recover of them the loss which he sustained by reason thereof.

The decision in *Thayer* v. *Vermont Central R. Co.*, (24 Vt. 440,) recognized, and approved, and held applicable to a portion of the claim by the orator in the present case.

The orator claimed, in his bill, that he had been under-estimated a given amount, for the payment of which he instituted the present suit; by the report of the master, the amount not estimated was found to be more than twice that amount. *Held*, that the orator should be limited to the amount claimed in his bill.

The report of a master in chancery upon the taking of an account, should contain a succinct statement of all the points made by counsel, and the facts found by him upon each point.

The testimony given *viva voce* before a master in chancery in taking an account, or a copy of it should be returned to the court with his report.

The master should also state the account at length and all the facts found by him so that they will be intelligible without reference to the testimony.

A claim which is exclusively of an equitable character is not barred by not being presented to the commissioners to allow claims against a deceased person's estate.

A decision once made by the supreme court is to be held as conclusive and final upon the point decided, and no re-argument of it can be had in the same case.

APPEAL from the court of chancery.

*The Vermont Central Railroad Company contracted with Sewall F. Belknap, for the construction of their railroad; and at a subsequent date, Belknap sub-let to the orator, or contracted with him for the construction of a certain portion of it. Both contracts were in writing, and contained provisions that the contractors were to be paid specified prices per cubic yard for the different kinds of work mentioned; that the work should be done to the satisfaction of the engineer of the Vermont Central Railroad Company; that the engineer should be the sole judge of the quality and quantity of the work specified in the contract, from whose judgment there should be no appeal; that no claim should be made or allowed for extra work, unless done in pursuance of *written* contracts or orders of the engineer; and the contract between the company and Bel-

---

*The copies furnished to the supreme court in this and the next following case (*Barker & Haight* v. *same defendants*) were returned to the counsel to be used in the further prosecution of the suits in the court of chancery, in consequence of which, the reporter is unable to present a statement of the case, more full, or which will probably be any more satisfactory than that contained in the opinion of the court, in which the facts are so far stated or referred to, as perhaps, to render any other attempted detail of them superfluous.

knap, provided that the engineer should, between the 1st and 10th of each month, estimate the quantity of work done, for which Belknap should then receive three-fourths of the amount to be paid him for said work, and the remainder after the completion of the whole work; and the corresponding provision, in the contract between Belknap and the orator, was, that payments should be made monthly, of three-fourths of the amount of the engineer's estimate of the work done. The orator commenced work under his contract about the 28th day of December, 1846, and continued it until the 16th of October, 1847; and his work in earth excavation was estimated and returned by the assistant or resident engineer who had charge of that section of the road, as being for the month of January, 6,600 yards; February, 8,800 yards; March, 6,000 yards; April, 4,300 yards; May, 7,500 yards; June, 11,641 yards; July, 5,000 yards; August, 5,500 yards; September, 7,200 yards; October, 3,275 yards; and for his work in rock excavation, for the month of August, 150 yards; September, 240 yards, and October, 218 yards. These estimates the orator complained of as too low, and for the recovery of the amount not estimated, as he claimed, he brought his bill in chancery against the said Belknap. During its pendency Belknap deceased, and letters of administration having been taken out upon his estate, the suit was revived against the administrator, and the Vermont Central Railroad Company made a party defendant to it, by a supplemental bill. Answers and traverses were duly filed, and testimony taken. The particular claims of the orator in reference to the above estimates, and the inaccuracy and falsity of them, and the proof respecting the same, is sufficiently stated in the opinion of the court for an understanding of the legal questions involved.

By the court of chancery, it was referred to two special masters to take the account between the parties; and they reported that, having heard the evidence adduced, and the arguments of counsel, they found the amount of work performed by the orator, under his contract, to have been in earth excavation 118,952 yards, and in rock excavation 2,394 yards; there being included in said quantity of earth excavation, 10,000 yards on account of a slide at Slip Hill, so called, which occurred in April, 1847, and was occasioned by excavations previously made by the orator, and wasted over the

enbankment into the river; they also reported the amounts they found due upon the orator's claims for building a blind culvert, building the "notch road," and for removing loose stone, and that the work was peformed by the directions of the engineer of the railroad company who had the charge of the work in that vicinity. The report of the masters was accepted by the court of chancery, who decreed in favor of the orator for the recovery of the amount which would be due, by the terms of his contract, for the amount of excavation reported, &c., from which decree the defendants appealed.

*Merrill & Willard, P. Dillingham,* and *T. P. Redfield,* for the orator.

1. A court of equity will set aside awards for fraud, partiality, misconduct or mistake of the arbitrator. 2 Story's Eq. 676. *Rand* v. *Redington,* 13 N. H. 72, and cases therein cited. More especially will equity interfere where the arbitrator is the appointee of one of the parties, as in the case of engineers' estimates. In *Mansfield & Sandusky City R. Co.* v. *Veeder & Co.,* 17 Ohio, 385, the court overruled the decision of the engineer, to whom a question of opinion and judgment was referred by the contract; and also his measurement of earth excavation. *Baynard* v. *Norris,* 5 Gill, 468. *Stamper* v. *Hawkins,* 6 Ind. Eq. 7.

Gross mistake is a sufficient ground for interference. *Boston Water Power* v. *Gray,* 6 Met. 169.

In the case at bar we show misconduct in the engineer; he did not bestow due care and fidelity in the performance of his trust. In *McIntosh* v. *Great Western R. Co.,* in the English chancery, (in Dec. 1850, No. Law Rep. 418) the contractor alleged in his bill, that the work had been completed, but not within the time, but that the delay had been caused by the company and the engineers acting in collusion, and by direction of company had refused to accept, &c. Held, that "where the inability of the plaintiff in "equity to obtain adequate relief at law, has arisen from the acts "of the defendant or his agent, whether such acts arose originally "from a fraudulent motive or not, this court will not permit such "acts to defeat the rights of the plaintiff."

2. The Vermont Central Railroad Co. should be held responsible to the orator. The injury has been caused by the fraud or

neglect of their officers.   Examination of testimony on this point.

It was for the interest of the company to have short estimates ; and under these circumstances no actual fraud need be proved.   1 Story Eq. 328, 365.   *McIntosh* v. *G. Western R. Co.*, *ubi supra.*

Where there is a breach of a legal or equitable duty, trust or confidence, justly reposed, and an undue and unconscientious advantage is taken of another, courts of equity will give relief.   1 Story 197.   And if acts have been, by fraud, prevented from being done, they will treat the case exactly as if the acts had been done.   *Ib.*

3. The orator, though a mere sub-contractor, may obtain relief against the railroad company, by a bill in his own name.   A claim may be enforced against one party, ultimately liable, by one ultimately entitled to the benefit of it.   2 Story on Eq. 497, 501, 502, 506.

The orator has an equitable lien on the funds in the hands of the railroad company.   Lien in equity does not rest in contract.   2 Story, 486.   *Burdett* v. *Willett*, 2 Vern. 638, (cited in Chitty's Dig. 284. Debtor and Creditor.)   *Foxcroft* v. *Wood*, 4 Russ. 487, (Chitty's Dig. Lien. 634.)   *Smith* v. *Everett*, 4 Bro. C. C. 64, (Chitty's Dig. Lien. 656.)

The orator has a right to proceed in his own name against the company, because of the insolvency of the estate of Belknap, in order to have a *marshalling of securities*, and to prevent the money due for the work going to the general creditors of the estate. The estate is insolvent, and it becomes necessary to have the aid of a court of equity to prevent a misapplication of the fund.

Equity often interferes where there is no privity of contract between the parties, and infers a trust and enforces it.   1 Story Eq. 441.   In this case, the orator's inability to obtain his compensation or relief has arisen from the acts and neglects of the railroad company, and a court of equity will not allow such acts and neglect to deprive him of his remedy.   *McIntosh* v. *Great Western R. Co. ubi supra.*

4. The writ survives with all its incidents.   The lien of a creditor's bill was not dissolved by the subsequent bankruptcy of the debtor.   2 Sandf. Ch. R. 494.   *Storm* v. *Waddell.*   Story's Eq. Pl. 289 and seq.

This proceeding will benefit, not injure the estate.   We seek a

decree as to the *marshalling of the assets*, and this alone confers jurisdiction. 2 Story's Eq. 478. 1 do. 505 and seq. The jurisdiction may be sustained on the ground that we call for an *accounting*. 1 Story Eq. 444. Also on the gronnd of our seeking *discovery*. The estimates were made by the company, through their engineers, and they have in their possession the means of testing the accuracy of these estimates.

*Peck & Colby* for the Vermont Central Railroad Company.

1. Orator is not entitled to any claim against the railroad company. There is no privity of contract between them. The bill puts the case on the ground that there was collusion between Belknap, the company and engineers, to have under estimates made. This is denied by the defendants, and there is not a particle of proof to support the charge. Orator then is not entitled to relief on this ground. 2. That the company are indebted to Belknap. If this were truc, the orator would have no lien or claim on the debt in chancery. The only way in which he could avail himself of the fund, would be by trustee process.

It is very clear that for whatever work the orator did, under his contract, he could only look to Belknap for payment. He could sustain no action against the company, as they were bound to pay Belknap. How, then, can it be insisted that he has a lien on any balance the company may owe the estate? *Hollingsworth* v. *Dow*, 19 Pick. 228; *Merrill* v. *Bartlett*, 6 Pick. 46; *Jarvis* v. *Rogers*, 15 Mass. 389–397.

A bill, by a creditor, to compel an alleged debtor of the estate to pay the debt to him, is never sustained, unless a collusion is shown between the admininistrator and debtor; 13 Vt. p. 657.

If there was a mistake in the admeasurement of the engineers, that does not give the orator any right to proceed against the company, unless they, by some act, occasioned the mistake. There is no evidence to show that they desired, or had knowledge of any mistake. The engineers acted, in their admeasurement, as the agents of all the parties.

The case being clear of all fraud, the orator is bound by the admeasurement of the engineer. It was part and parcel of the contract, that both parties should be concluded by his decision.

*Dubois* v. *The D. & H. Co.*, 12 Wend. 334; *U. S.* v. *Robertson*, 9 Peters. 558; *Monongahela R. Co.* v. *Fenton*, 4 W. & Segt. 205; *Ennis* v. *O'Conner*, 3 Har. & Johns. 163; *Wilson* v. ————, 11 Gill. & Johns. 58; 15 Wend. 90; *Faunce* v. *Gordon*, 16 Penn. 469; *Underhill* v. *Van Cortland*, 2 Johns. Ch. 339.

If the orator is at liberty to avoid his agreement, in this particular, on the ground of a mistake in the admeasurement, that mistake should be proved beyond all reasonable doubt. It is not enough to make a doubtful case. The proof should be full, clear and irrefragable, or the court will not interfere. The orator has made no such case. This point is to be considered irrespective of the masters' report. The question is, do the proofs make such a case as justified the chancellor in sending the case to the masters? *Brown* v. *Brown*, 1 Vern. 157, reported in 2 J. C. R. 362; *Ridout* v. *Paine*, 3 Atk. 494–644; *Knox* v. *Simonds*, 1 Ves. Jr. 369; *Morgan* v. *Mather*, 2 Ves. Jr. 15; 2 Story's Eq., p. 697, § 1456.

The opinion of the court was delivered, at the April Term, 1855, by

REDFIELD, Ch. J. This being a bill brought to obtain payment for work done on the Vermont Central Railroad, beyond, or aside of the estimates of the engineers; and the contract, by which the company let the work to Belknap, and also that by which he underlet a portion of it to the plaintiff, containing a provision, in these words, " and the engineer shall be the sole judge of the quality and " quantity of the work, and from his decision there shall be no ap-" peal," the recovery can scarely be claimed upon any other but one of two grounds; 1, that the engineers, without the fault of the plaintiff, have failed to make an estimate within the fair import of the contract; or, 2, that having made one, it is so erroneous, as not to be binding upon the parties, under the contract.

We think there can be no question that this stipulation does bind the parties to abide the decision of the arbitrator named, as much as that of any other umpire or arbitrator. And, in one sense, the submission to the determination of the engineer is more obligatory than any ordinary submission, inasmuch as being upon consideration, it is not revocable, and the obligation upon the defendants to pay, does not, by the terms of the contract, arise, until the

estimates are made by the engineers. But, this being a peculiar species of contract, so far as the umpirage is concerned, that being referred to the agents and servants of one of the contracting parties, persons in the employ, under the control, and in the pay of that party, it seems, from necessary implication, to impose upon that party the obligation to employ competent, upright, trustworthy persons, in this service,—and to see to it, that they did this service in the proper time, and in the proper manner. And these estimates, when made, are, no doubt, entitled to the common presumption in their favor, *omnia rite acta.* But, being of a nature where perfect accuracy is attainable, or nearly so, and made by a class of persons altogether in the interest and under the control of one of the contracting parties, it would impose, doubtless, some duty of watchfulness, as to the persons employed, and, also, in regard to abstaining from all attempts, mediately or immediately, at influencing them in their action in the premises. And, while it is undeniable that a full and fair decision of the engineer is as binding as any other award of an arbitrator, and practically, (on account of the vast extent of the work, and the vital necessity of the company and the contractors knowing, as they go along, how they stand, and closing their accounts from time to time, beyond the necessity of revision,) more emphatically entitled to exemption from reëxamination, upon slight or factitious grounds. Still, it must be apparent that, in the matter of proof, the decision of such an arbitrator, when brought before a judicial tribunal for revision, as they are always liable to be, are exposed to more watchfulness, and carefulness of examination upon those points where, from the nature of the case, they are exposed to peculiar liability to infirmity. No fair mind, competent for such an examination, could fail to perceive this. But this surely will not justify any court in setting aside such a determination, upon any but the most unanswerable grounds. It must be obvious to all, that, the parties must have felt the necessity of such an umpirage, or they would not have provided for it,—and that, having provided for it, by the express stipulations of their contract, they must now abide by it, and not expect a court of equity to relieve them from the probable consequence of their contract, however disastrous it may possibly have proved, to their reasonable or unreasonable anticipations.

I. We think it is not the fair interpretation of this contract, that all these estimates were to be made by the chief engineer. Contracts must be construed with reference to the subject matter, and made, as far as is consistent with the terms used, reasonable and just. One altogether unacquainted with the matter of such extensive works, from the word engineer being used, in the singular number, would, almost of necessity, conclude it must have had reference to the chief engineer alone, else the word would have been written in the plural, as applicable to the several resident or assistant engineers. But when we come to know that, practically, the chief engineer never does, and never can, make these estimates, or even verify those made by others,—that the thing is altogether impracticable,—we must conclude that the parties had reference to something which was usual, or, at least, possible, in such cases. And this, we find to be the estimate of the engineer having charge of the section, who is called the resident engineer. And this meets the terms of the contract, as well as by referring it exclusively to the action of the chief engineer.

We need, perhaps, spend no time upon the question, what would be the rights of the defendants, if no estimates of the plaintiff's work had been made by the company's engineer. For the plaintiff bases his claim upon no such state of facts, and he cannot expect to recover upon a case not made in his bill. If the plaintiff's work had failed to be estimated, through the fault of the engineer, or the company, or Belknap, it does not now occur to me that there would probably be any difficulty in obtaining a recovery, at law.

But, the case which the plaintiff makes, in his bill, is, that the estimates were made regularly, but made intentionally too low, and improperly made. 1. It is charged that the chief engineer, at no time, made the estimates, as *he* should have done, but allowed them to be made by one Collins, in the latter portion of the time the plaintiff worked, who is called a sub-engineer, in the bill. 2. That before March 24, the plaintiff supposed the estimates correct, " but " from subsequent discoveries, is led to believe that these are some- " what too small, and were not as accurately made as they should " have been." This could scarcely be regarded as any charge of fraud or mistake in these estimates, or as any ground of claim against Belknap. But, 3d, it is charged, or stated, that the esti-

mates after this date, which are all set out, amounting to 44,416 yards of earth and 608 yards of rock excavation, are, in terms, "only about one-half what they should have been, were hasty, "careless and incomplete, and operated as a great and gross fraud "and damage upon and to your orator." It is further charged, that these estimates were so made, by the connivance of Belknap, "for his own relief," in making monthly payments, and "to embar- "rass the orator, and cause his failure." 4. There is a charge, too, in the bill, that the orator was not allowed to work at the most profitable portion of his section, but this is abandoned on trial. 5. In a supplement to the bill, or amendment, the plaintiff claims for removing loose rock, in the pit left by Barker & Haight, which he claims to have been 600 yards, at sixty cents. 6. That, con- trary to his expectation when he entered into the contract, he was compelled to excavate about 300 yards of rock, under these loose stone, and near the grade of the road, which cost about twice as much as the ordinary rock excavation. This second claim, in the amendment, seems pretty much abandoned on trial; and the first claim in this amendment, either comes in under the general claim, for under-estimates, or else, as extra work, so that the plaintiff's claim in his bill, which is finally persisted in, must be limited to 44,416 yards of earth and 608 yards of rock excavation, and the removing loose stone from Barker & Haight's pit. And, this is claimed, on the ground of a fraudulent under-estimate, by conni- vance between Belknap and the engineers, and, also, the haste and inaccuracy of the engineers themselves. This is the main basis of the plaintiff's claim, for the supplemental bill is only against the company, and, chiefly, brought for the purpose of bringing them in as a party defendant. If the plaintiff is entitled to recover, it is for this deficiency in the estimates, and, on the ground it was pro- duced in the mode alleged. It is probable the allegation is broad enough to include both a mistake and an intentional under-estimate, inasmuch as inaccuracy and incorrectness, haste and inattention, in the engineers, are charged, as well as connivance and collusion on the part of Belknap. But, it must be confessed, the chief stress is laid, in the bill, upon the intentional under-estimate, with the pre- conceived purpose of defrauding the plaintiff. But how the plain- tiff, under the bill, can expect to recover more than he claims, is

certainly not very apparent. It may have been his innocent misfortune, not to put his claim sufficiently high, but, after so much controversy, it would seem that he should, at least, be bound by his own estimate of the wrong done him. The fact of his being able to prove more loss than he himself believed he had suffered, in the outset, is certainly calculated to throw suspicion upon the accuracy of the mode of computation finally resorted to by the masters. And when he actually recovers more than four times as much, for rock excavation, as he believed himself entitled to, it seems to me quite as much calculated to impeach the accuracy of the masters' report, as it does the estimate of the engineer. It shows pretty conclusively, that, there must have been false engineering in the case, somewhere. The engineers certainly had much the best means of estimating the true amount of excavation, and it is incomprehensible to me, that any contractor, in a thorough cut of rock, should have submitted, for a single month, to an estimate of only one-fifth part of his rock excavation, which was attended with such expense, and was so important. There was scarcely an operative upon the line of the road, even the most uninstructed Irishman, who would not at once have exclaimed out upon such falsehood. And we have certainly not learned that the plaintiff is uncommonly deficient in the knowledge of geometrical or solid admeasurement, or in the general principles of mathematical proportion, or that he is more than ordinarily averse to such speculations, or that he is specially indifferent to passing events seriously affecting his pecuniary interest. Taking him, then, as an ordinary man, and we can view him in no other light, we think it it must be apparent to all, that, the very great excess of the allowance made him by the masters, beyond the utmost verge of his claim, is calculated to excite apprehension of some latent infirmity in the mode of their proceeding. At all events, we think, the plaintiff must be content to limit his recovery to the amount claimed in the bill. Beyond that, we have no occasion to speak, at present, of this excess allowed the plaintiff by the masters.

II. We may here, perhaps, look into the general rules of decision in courts of equity, which must govern this case. The claim put forth in the bill, being either mistake or fraud in the estimates, is one clearly of equity cognizance. Fraud, accident, and mistake form

appropriate branches of the general jurisdiction of the court of chancery in England and in this state. So, too, as to the particular subject of awards, the ground upon which redress is here sought was originally confined exclusively to equity. The courts of law did not, until quite recently, and never, as a general thing, hear evidence of fraud or mistake in the arbitrator or undue influence in the prevailing party, unless it appeared upon the face of the award, either explicitly or by obvious implication. 2 Story, Eq. Jur. § 1452. Bac. Ab. Tit. Arb. and Award. 239. *Wills* v. *McCormick,* 2 Willson 148. *Newland* v. *Newland,* 2 Johns. 62. *Barlow* v. *Todd,* 3 Johns. 367. *Bulkley* v. *Stewart,* 1 Day's Cases in Error, 120. *Cranston* v. *Kenney,* 9 Johns. 212. These citations might be carried further. But the whole subject of law and equity jurisdiction over awards is so thoroughly investigated, from the civil law, through the common law and equity laws of England, by Chancellor Kent, in *Underhill* v. *Van Cortlandt,* 2 Johns. Ch. 339, as to leave nothing further to be desired upon the subject, and to show very clearly that, in a case like the present, the party's only remedy is in a court of equity. Mr. Justice Story too, devotes one entire chapter in his Eq. Jurisp. 2 vol. p. 913, to the subject of awards, in which he comes to a similar conclusion, § 1450 *et seq.* This is sustained upon the ground of discovery, and setting aside the award, and also on the ground of fraud, accident, or mistake.

1. If the proof only establishes mistake in the engineers, but no undue influence over them by the company, and no suppression of the truth after the mistake is discovered, it would seem, upon general principles, the plaintiff cannot recover of the company, there being no such privity of contract and no such co-operation in producing the wrong, as is requisite to make them liable. It was, indeed, slightly claimed, on the hearing, that the company are liable upon the contract to Belknap for not employing proper engineers, or enough of them, at all times, as the injury fell upon the sub-contractors. But the proof is but imperfect upon any such ground. This portion of the claim was put mainly at the hearing upon the ground that the company had a fund designed to go to the orator, and which he may go directly against, even without joining Belknap, it would seem, as he is now dismissed

from the proceedings, or showing positive connivance of the company. Without going very much in detail into the doctrine of marshalling assets, it seems very obvious to me, that the proof, in this case, will justify no such claims, or no claim upon this first ground, against the company. The company hold no specific fund against which the orator would have any claim upon the ground that, by mistake, the engineers had failed fully and correctly to estimate his work, and of Belknap's insolvency, any more than he would have upon the mere ground of Belknap being indebted to him, and the company to Belknap, and Belknap insolvent. And it is familiar law that this is no ground of sustaining a bill in equity.

The creditors of an estate could not maintain a bill against the debtors of the estate, upon the mere ground of the indebtedness and insolvency, and this case viewed as a claim for mistake in the estimates merely, is nothing more. This is too familiar law to require debate or authority, which latter is indeed abundant. We may illustrate this by reference to the mistake of ten feet in the heighth of a bench on one of these points of excavation, which must have affected very essentially the proximate estimate, and which does not appear very satisfactorily to my mind to have been properly corrected, and which if it affected the monthly estimates to the same extent, would surely be such a mistake in the decision of the engineers as a court of equity would correct and give a remedy against Belknap for, so far as it was clearly shown to have lessened the amount allowed. But although this same decree of the court of equity might lay the foundation for a recovery by Belknap against the company, it would not enable the plaintiff to go directly against the company.

2. But if the proof establishes connivance on the part of the company or their agents in bringing about under estimates, (whether with the motive of ultimately making full estimates, and thus only obtaining relief in a moment of pressure, or of defrauding the contractors, and thus making a saving to themselves, is not essential, so far as the remedy directly against the company is concerned,) the plaintiff is confessedly entitled to a decree against them and their accomplices, for the loss thereby sustained. And he may probably claim a similar decree against Belknap, whether, as to him,

the proof establishes fraud or only palpable error in the estimates, as the bill against him goes upon both grounds, and he is bound by express contract to have the work properly estimated by competent engineers. But it is questionable how far the contract of the company with Belknap enures to the benefit of sub-contractors, even as to the engineers. There is no more privity there, than in the other portions of the contract. There could be no sub-contract without the consent of the company. But this, if fairly implied in this case, created no privity between the company and plaintiff.

But the bill against the company makes no claim upon the mere ground of Belknap's death and insolvency, and the company's indebtedness for the same work to Belknap. All that portion of the agreement is then effectually disposed of by there being no such claim in the bill, as well as by its untenableness. But the bill claims to recover of the company for the "new road ;" for the removing of the loose stone left in the pit by Barker & Haight ; and for building the blind culvert, upon the ground that this was work not within the contract with Belknap and done by direction of the company's engineers. This claim as against the company seems precisely like that made in *Thayer* v. *Vt. C. R. Co.*, 24 Vt. 440, and that decision is entirely satisfactory to the court, as applicable to the facts, in this case. There is not, in the evidence, the remotest probability that the plaintiff ever supposed he was doing this work on the credit of the company, and it is certain he had no just reason to suppose so. All the contracts in relation to this section expressly require that claims for extra work shall be supported by written orders from the engineer and be immediately presented for allowance. The plaintiff took no steps to perfect any such claim against Belknap, and there is not one particle of evidence to show that at the time the work was done, he ever expected to make any claim for it directly against the company. We must conclude then, that he did expect to have it estimated in the common course of allowance against Belknap, as most of it seems to have been, at something. The road on slip hill was so estimated, and the blind culvert ; but it is said this was attached to a prior estimate, which had been paid. But if attached there, it seems to me, the engineer, on the most charitable construction, might fairly be presumed to calculate that it would be taken into

the final account of all estimates to plaintiff and is not necessarily chargeable with fraud in doing it. Possibly, perhaps probably, the loose stone may not have been estimated to any one. They could not properly be estimated to Barker & Haight till removed and when removed by plaintiff, he should probably have had pay from some one, what it was worth, but if they had failed to be estimated, through the fault of the engineers, we do not, as was said before, see any objection to a recovery at law against Belknap, if any where. If it were to be regarded as the extra work, which it is claimed to have been, both in the bill and in the argument, it is not very obvious how Belknap could recover for it of the company, or the plaintiff of Belknap. The only possible mode of reconciling such a recovery with the contracts would be, as the supplemental bill attempts to do, to allow a claim directly in favor of the plaintiff against the company, between which parties there was no written contract to embarrass the matter. We have said all we need upon this view. The objection here is, that there not only is no written contract between the parties, but no contract of any kind, either express or implied.

The supplemental bill further claims that the company shall be liable for all plaintiff's loss by under-estimates, by reason of their connivance and collusion with Belknap and the engineers, in inducing such under estimates, and, also, on the ground of employing incompetent and unfaithful engineers, which seems valid, if proved.

III. The plaintiff's claim then is narrowed down to 44,416 yards of earth excavation at ten cents, and 608 yards rock at eighty cents, and if this is made out upon the ground alleged, it might fairly entitle the party to recover for the amount reserved upon the estimates, already paid for, by way of damages, if the court should be satisfied that the plaintiff was compelled to abandon the contract, in consequence of these fraudulent under estimates. The right to recover to this extent must depend upon the evidence. There seems to be no other just impediment remaining as to this portion of the claim. This inquiry naturally and legally becomes two-fold. 1. Is there proof in the case, aside of the report of the masters and the evidence before them, to justify the reference?

In regard to referring a case to masters, the chancellor undoubtedly exercises, to a considerable extent, a discretion where the

proofs are attended with embarrassing doubts. In such cases, no doubt, a reference is often made, and justly too, with a view to relieve the mind of the chancellor upon a particular point. An issue is often sent to a court of law to be tried by a jury, for the same or similar reasons. But in a case like the present, where the court are asked to set aside a contract and virtually to reform it on the ground of mistake, (I refer of course to the award, which is virtually but the consummation of a contract between the parties,) the case could not properly proceed to the reference, unless the court were very satisfactorily convinced of the mistake in the first instance. And the same rule would apply where the court were solicited to set aside a contract on the ground of fraud. The extent of the remedy would be governed exclusively or chiefly by the finding of the masters, under such restrictions as the court might impose. But the mode of proceeding before the masters is exclusively under the control of the court. And, in a case like the present, they might require the masters to proceed in finding the deficiency in the estimates exclusively upon the principles of exact admeasurement, if they judged it more conducive to justice. The report of the masters, in the present case, does not possess any thing more than an approximation to accuracy. And approximations are of almost all conceiveable degrees of nearness, and still claiming the same generic name.

But upon the very point of the testimony being sufficient to justify a reference to the master, it seems to me, rather difficult to resist the conviction in the mind that the estimates made by the engineers, did not come up to the contract or to truth. The stipulation in plaintiff's contract with Belknap is that "payments shall be made monthly of three-fourths the amount of the engineer's estimate of work done," referring very obviously to the monthly estimates stipulated for in the company's contract with Belknap, for the kind of estimate and the manner of being made. By referring to this contract, it seems to me, that it can fairly be understood only as importing a conclusive estimate, monthly. There is certainly nothing in the contract and nothing in the character of the subject matter shown or known to us that would lead any one to expect that any more accurate estimate was to be made one time than another. This seems to have been an arrangement for the

conveniecne of the engineers chiefly. And if attended with no embarrassment or consequent loss to the plaintiff, I could not feel justified in interfering with the estimates, on that account merely. But, as it seems to me, to be a departure from the contract, by which no definitive estimates were made, except at intervals of some number of months, and by the mere act of engineers, as it seems to me, or possibly by connivance of the officers of the company, if any ultimate loss occurred to plaintiff, by reason of this departure from the contract, it would seem it should fall upon those who were responsible for this deviation from the course prescribed in the contract.

It might be of some importance whether these estimates are considered to import merely the judgment of the engineer, upon the amount of work done, or an accurate measurement. But from the known practice in such matters, there seems no good ground to question, that the estimates stipulated for were strictly mathematical admeasurements. This being so, it is obvious to remark, that mistakes and under-estimates could be more readily ascertained, and more satisfactorily proved, and that the more frequently such estimates were made, the more accurately could the exact amount of excavation be known. If the final estimates were to be deferred till the work were completed, or nearly so, it must, from the very difficulty of knowing the form of the surface on slopes, be far more inaccurate, than the original proximate estimates. In looking into the estimates made for plaintiff after the 24th of March, the very form of the estimates, being in round numbers, shows, that for every month, except June and October, the estimates were nothing more than a mere arbitrary judgment, or conjecture, what we call, in popular language, a rough guess. The estimates then for April, May, July, August and September could not be regarded as any such estimates as the plaintiffs' contract required. But being made and returned, they might require to be set aside, in a court of equity, to enable the plaintiff to recover, for any deficiencies in them. And we may suppose that such rough conjectural estimates would be liable to be very much swayed, by the slightest influence, either of the company or Belknap, and especially the former. And the June and October estimates being claimed to be final, this is claiming them all to be final.

45

And in looking into the testimony in regard to these estimates, there is certainly a great deal, which looks as if the necessities of the company induced them to connive at very inadequate estimates. It is scarcely possible that, if the company desired to produce any such result, with the class of men they had to deal with, and their relation to them, they should not have been able to effect their purpose.

All the testimony goes to show that, during the whole time, the company were pressed to the very verge of bankruptcy; and its officers, men of the most tried and chivalrous honor and integrity, to save the utter failure of one of the most cherished enterprises, felt compelled to drive the contractors off the road, north-west of Montpelier, unless upon particular points, requiring much time for their accomplishment. And although the plaintiff's job was one of these points, yet, in one instance certainly, the president of the company did resort to an evasion with the plaintiff, which, if he had not bought off, must have put an end to his operations, and which was so expressly in violation of the company's contract of letting with Belknap, by which they promised to assure the right of way, and so much in conflict with the general course of conduct of that high-minded man that when, in his testimony, he was inquired of in regard to it, he unhesitatingly disclaimed the transaction, as something which he could not have done, "because he had no right to do it!" And still the fact is shown under his own hand, in regard to which there is, of course, no chance of error. And the president of the road told George W. Barker, that Belknap would not wish to pay the hands, on that part of the road, long, after the estimates were stopped. Some other witnesses testify to similar statements of Gov. Paine; Loomis Palmer for one, to his showing sensitiveness that the work was not discontinued towards Burlington. Some expressions of Paine, (as to Phinney,) show that he was willing to hold out that, if Belknap persisted in doing work on that end of the road, the contractors would not get more than enough estimated " to pay the shovellers." I do not say how reliable this testimony is. The witness was not before us. But of Barker's testimony there can be no doubt, or Palmer's, or Paine's letter, or of the general course of Paine's talk, about this date, that money was so short that the work could not go on, at that end of the road, and if worst

came to worst, the estimates *must be reduced* to the *starving point*. and finally withdrawn altogether. It was only Paine's interference, and Beckwith's letter to Collins, which could raise the June estimates, in the words of the letter " to about the full amount of his estimate " !    I do not find the letter among the exhibits, but such proof came out in the case somewhere.

It may be questionable how far this will justify a court in concluding that Gov. Paine, as president of the defendant's company, had formed any deliberate purpose of defrauding the contractors. Knowing as much, as I think I did, of the man, it would produce no such effect upon my mind.    And I could not justify it to my sense of justice, to find a fact, which I would not dare to say, in view of any present or future accountability, I believed; or which I should hesitate to state if the man were alive.    But if the testimony clearly established a deficiency in the estimates to the orator, and I think that must be regarded as pretty satisfactorily made out, in various modes, I should conclude such talk of Paine, had an influence upon the subordinates of the company, even beyond what it was intended to have.    And I am inclined to think Paine desired to have the estimates kept down to the very lowest possible point, during that severe pressure, and especially on that portion of the road.    And such talk could not fail to be made known to the engineers, and with men of moderate capacity, and only a common share of firmness, it is impossible to conjecture how much the knowledge of such a desire, in a superior, who held the very means of their daily subsistence in his will and control, would be likely to influence their estimates, especially, when made, by mere guess, as it is evident most of these were.

It seems to me that the knowledge of such a desire, in the controlling power of the company, must have had a very marked influence upon the monthly estimates, where they were at all subject to variation, and that it might influence even those made from actual measurement.

Another proposition which seems to me fully established is, that the estimates do come very considerably below the proximate estimates on section eleven of the second division, allowing for slides which went into the river, and for those which had to be removed again.    And these latter, it seems, the engineers treated as properly

to be estimated to the contractor. All agree that the proximate estimates were ordinarily too low, and that one mistake in the proximate estimates, now acknowledged by all, did affect them in one cut, to a very considerable extent, so that the conclusion seems almost inevitable that there have been under-estimates, on that section, to the contractors; and the testimony seems to me to show that it more probably happened, in these estimates, by Collins, to this orator, than at any other point, so that I feel reasonably satisfied that they did happen here to some extent. I should therefore refer the matter to some tribunal to estimate the deficiencies. And if the chief officer and agent of the company, willingly produced this, to some extent, although, as I believe, intending that ultimately every cent should be paid, on full estimates, to all the contractors or sub-contractors, I must still conclude that the company were responsible for this deficiency in the estimates, if it happened never to be made up, as this never was and never could be, if Kennedy's testimony is reliable, in regard to this matter, and it seems to me it is. For all the testimony, and the conduct of the officers of the company, goes to satisfy me, that this work of estimating, monthly to plaintiffs was done in the lowest manner, and never, at all, in conformity to any just construction of the contract, but still probably in such a manner as to embarrass a recovery at law. And Paine's appeal to Belknap and the engineers to give larger estimates, or full estimates to plaintiff, just before the June estimate, is altogether satisfactory to my mind to show, that they all understood, that their estimates were mere approximations, and quite under the control of the engineers and officers of the company and Belknap, and that in this way, they could strangle any man they chose. Paine's talk shows this. And in this connection, Collins' slang " of plaintiff's dying off when frosty nights came," and its literal fulfillment, are, to say the least striking coincidences. This building railroads of such vast expense, with no adequate means, is desperate business, and I do not think we should be surprised to find desperate efforts, and desperate expedients resorted to by the best of men, whose very lives and all earthly hopes stand upon the event of their success or failure. I feel that my judgment upon this testimony is charitable, but that it is truthful. But even with such proof, I could not feel justified in allow-

ing a court of equity to interfere to correct estimates, which at the time were acquiesced in by the contractors. The necessity of having such vast undertakings closed, as the contract specifies, and as all reason requires, would induce me not to interfere, unless complaint was made at the time.

This determination is here supported, too, by the plaintiff's complaints at the time. But when I look into the report of the masters, it may be the nearest approach to truth, which can now be attained, but it seems to me a most extravagant finding, so extravagant, that it has at times staggered me in regard to the whole case, and half led me to conclude we should run the least hazard of being absurdly imposed upon, by dismissing the bill, and saying to the plaintiff, if he could not make a clearer and more rational case, he must not expect the estimates to be set aside. And the immense difference in the estimates of engineers, and in the results of the different modes of approximation, shows that there is no great certainty in this kind of proof. But the claim in the bill will limit the matter to one half the amount allowed by the masters, and I cannot but believe, from all the testimony and attendant circumstances, that this is twice as much as the real deficiency could have been. I cannot believe, any contractor, of half common sense, would submit for a single month, to half estimates; the very supposition is absurd! And then, even after this bill is brought the orator himself swears in his affidavit, which is part of the case, and which the court may look into, therefore "I believe I have a just claim, &c. of about $4.000," and finally obtains a decree for more than twice that amount, nearly three times. It is obvious to remark that such a suitor certainly was late in discovering the extent of his injury.

In regard to Belknap's liability, no further discussion is necessary inasmuch as his contract with plaintiff must be regarded as binding him to see that the work was properly estimated. It would be absurd to suppose that the plaintiff would have bound himself to abide any other estimates. And as he could not look to the company for this, having no contract with them, he must rely upon Belknap, if any one. And Belknap's contract with the sub-contractors must be regarded as a virtual endorsement of the same stipulations, which he had with the company, to such contractors, or

more properly a renewal of such stipulations, as he could not endorse those of the company.

This will render Belknap liable on his contract for the mistakes in the estimates, and, as the bill sufficiently charges that, there is no need of looking into the question of his knowledge of the estimates being too low as they progressed, and virtually conniving at it, for the present, on account of the pressure and difficulty of obtaining funds.   The testimony of Scott, the clerk of Belknap, which seems to me very reliable, certainly shows that Belknap claimed always a very considerable under-estimate in the work, as a whole, and that there was no pretence of his owing the company till after his death.   And had he lived, there is, in my judgment, little doubt the balance would have resulted very largely the other way.

It seems to me, therefore, that some kind of reference to the masters of the court of chancery was justified by the state of proof in the case.   But as the reference was made before the case was heard in the court of chancery, and very likely before the counsel knew much of the detail of the testimony, it went to the masters in a very loose and unsatisfactory manner.   And going into the case, in this loose manner, and having kept no record of their proceedings, and the testimony given before them, and made no statement of the facts proved before them, or found by them, it is perhaps no matter of surprise that the result to which they came, has but little applicability to the case, as it stood in court.   But, for that or some other reason their report seems to us altogether unsatisfactory.   And, although at first, I was inclined to patch it up, and let it stand for some $4,000, a critical examination of the case with reference to the authority, satisfied me it could not be supported to any extent.

I. It is altogether deficient in form.   According to the English practice it contains almost none of the requirements of a master's report in chancery.

1. It should contain a succinct statement of all the points made by counsel and of the facts found upon each point.   This, in the English practice, is submitted to counsel, after being drawn up by the masters, at a meeting for settling the form of the report and noting all exceptions on either side.   But in our practice, this

formal hearing before the masters is dispensed with, and the exceptions filed to the report, after it comes into court. But the facts found by the masters, not the general sweeping results, but sufficient of the details to show the ground of their decision must be stated. This is altogether omitted in the present case. And the omission seems the more inexcusable, as the defendant's counsel left in their brief, (used before the masters, and which came before this court, and which is elaborate and specific,) particular requests to report, in detail, upon the process, which they should adopt in coming to their conclusion. Both upon the ground of the general rule of law, applicable to masters reports in chancery then, and of the specific request, this omission seems to us fatal to the report. And the omission seems to us altogether inexcusable inasmuch as it was so importunately demanded, both by the counsel, and the nature of the case. It is this consideration, among others, and chiefly that the proceedings are of no avail in the case, as they might have been, if the masters had pursued the usual and prescribed course which has induced this court to strike the master's fees out of the bill of cost.

2. The masters have wholly omitted to report the testimony given before them. This, according to the English practice, is always required. It is not done as part of the report, but in separate forms, and filed in the proper office, to enable the court to revise the finding of the masters, if it is desired on any account. The rule is in these words, Order 69 of 1828, which is the earliest English order allowing the *viva voce* examination of witnesses before the masters, in taking an account, " The master shall have " power, at his discretion, to examine any witness *viva voce*, and " the testimony upon such *viva voce* examination shall be taken " down by the master, &c., and preserved that the same may be " used by the court, if necessary." 2 Daniels Ch. Pr. 1387. This seems to us another fatal omission, in the report, and, one which, in a case like the present, renders the report of no value in the case. And, although, no request was made upon this point, and a loose practice may have prevailed in some parts of the state, it is no sufficient excuse for the omission. It is understood by the masters in some counties, and should be in all, that a copy of the *viva voce* testimony given before them, in taking the account, must

be returned. If a report in the form of the present one, and in spite of the requests and remonstrances of the party, on either side, as the case may be, is to stand, it is the master, and not the court who tries the case. For as this case now stands, if the master's report is to be upheld, it must be admitted that the hearing before the chancellor, or in this court, is of very slight avail. It is of none the slightest consequence except upon the mere question of reference to the master. That being determined, the question whether the plaintiff shall recover one hundred or ten thousand dollars, is not subject to any revision whatever. This is not the true theory of a court of chancery. The chancellor in the first instance, and this court, upon appeal, must revise, if need be, the whole hearing before the master. It must, at all events, be in a shape in which this can be done. 2 Daniels, Ch. Pr. 1475 —1490 and note.

We ought, to prevent misapprehension, here to say, perhaps, that this rule will not excuse the master in doing what Lord Eldon calls emptying his wallet upon the shoulders of the court. He is still bound to state the account, at length, and all the facts found by him, so as to be intelligible without reference to the testimony. This is what Ch. Justice Williams is insisting upon in the case refered to in the argument.

II. But the report, itself, as far as we can comprehend the basis upon which it proceeds, is quite unsatisfactory to us.

1. It is more than twice as large as the amount claimed in the bill, and almost three times as much as the sum sworn to be due by the plaintiff in the outset, and to us it seems fair to conclude that, in the outset, the plaintiff himself would be likely to estimate his injury quite high enough, and if he is so unfortunate as not to do this, he ought to be content to lose the excess, as a just penalty for his excessive modesty or his uncommon stupidity.

2. Some of the details of the report seem to us equally incomprehensible. The plaintiff is allowed by the masters more than four times the amount of rock excavation which the engineers of the company estimated to him. This is done in a through cut, where there is no difficulty whatever in a common mason or teamster coming readily to a very near approximation of the actual excavation made from time to time. And to suppose that, when the pay

was so considerable for this work, and the importance proportionably great, any engineer should dream of satisfying a contractor with less than one-fourth his just due, is making him more simple than any testimony in the case will justify. I think it equally difficult to believe that the plaintiff could possibly have been pacified with any estimate one-half as wild as this. The truth undoubtedly is that no such absurd estimates were ever made. For if the engineers had desired to depress the estimates, as they did, I think, they would sooner do it any where else than here. And we do not learn either from the bill or the testimony that any great complaint was made, at the time, in regard to the estimate of rock excavation. Even at the time the suit was brought it seems to have attracted very little attention. It is only mentioned incidentally in the bill.

3. The slide of ten thousand feet of earth into the river, which is allowed by the masters at one thousand dollars, as earth excavation, seems to me manifestly not to come within any just idea of excavation under the contract. It does not seem to have been the result of any art or contrivance like bringing a stream of water to bear upon the bank, which has been treated as a legitimate mode of excavation under similar contracts. But this slide and others at this point, were altogether accidental and neither expected nor desired. Neither did they come within the range of what was originally intended as the bed of the road.

This slide, and numerous others, near the same point, resulted from the breaking away of the bank, from time to time, which rendered it necessary to carry the bed of the road further back into the hills. At the price agreed to be paid for earth excavation, these slides, at this point, would, in all, amount probably to nearly $10,000. And where they fell into the road bed, and were required to be again removed, the engineers uniformly estimated the removal. But where they fell at once into the river, from a point not originally, or until the convulsion, intended to have been excavated, there seems no more reason why they should be estimated as excavation, under the contract, than if the whole hill, from its very base, had been at once removed, by an earthquake or a volcano. It seems to us the engineers did right in rejecting this claim. And, right or wrong, their decision, if fairly made, is conclusive upon the parties.

I have been somewhat staggered, in regard to the reliableness of the investigation of the masters, in this case, in finding that its results seem to be little more than an endorsement of the plaintiff's exhibit of December 28th, 1850, referred to in the deposition of Walter Forsythe, for, I think the coincidence could not have been altogether accidental.    This exhibit is nothing more than a comparison of the labor, under the written contract, with the results of the work done by the same plaintiff, under a prior verbal contract, as allowed in the engineer's estimates.    And it is obvious, at the first glance, that such a mode of estimating, is nothing but a mere basis of conjecture.    It is perhaps better than nothing.    But when its results give the plaintiff twice or three times as much as he ever claimed, at the time of the transaction, it should lead every practical man to suppose that they are wide of the truth.    And it would seem that so much labor, as the masters seemed to have performed in the case, should have produced something more satisfactory than a mere arithmetical calculation, in simple proportion, which any one could institute in twenty minutes.

The point made in the case by the defendants, that the claim, as to Belknap's estate, was barred, by not being presented to the commissioners, is regarded as fully settled, in this state, against the bar of claims exclusively of an equitable character; *Sparhawk et als.* v. *Buel's Estate*, 9 Vt. 41.    The same principle has been repeatedly recognized since.

We have not attempted to go into any consideration of the equities arising out of the relation of these defendants to each other. That subject is not properly before us at present.    That could only properly be determined upon an issue between the defendants themselves.

The decree of the chancellor is reversed, and the report of the masters set aside, and the case remanded, to be proceeded with according to the decretal order on file, *q. v.*

---

At the November Term, 1855, the orator made a motion to amend the above mandate, which was sent by this court to the court of chancery, at the preceding term, particularly in regard to

an order of this court, that, no costs should be taxed by the orator, if he should finally recover in the case, for the hearing before the masters, or the fees of such masters, the report having been set aside by this court, and a new investigation ordered.

·By the court. It is well settled in this court, that, one decision of any point in a case, is to be held conclusive in that case. And even in cases where the court have overruled a decision made in one case, in some other case, this is no ground of altering the decision in any case where the decision was made before it was overruled. A contrary practice would lead to interminable reëxamination of the same question, in the same case. So that it has been settled, since about the year 1825, that argument is never to be had, in this court, upon a question once decided, in the same case, whatever we might feel disposed to do if the same question should arise in some other case. *Dana* v. *Nelson*, 1 Aik. 252. This was a case in chancery, where a decision upon the demurrer to the bill was held conclusive of the law, upon the merits of the case, although by a divided court. But, in a case at law, or in a chancery case, upon its merits, no question has ever been made that one decision, as to the law of the case, made in this court, must be the law of that case, in this court, as well as in all other courts. *Ross* v. *The Bank of Burlington*, 1 Aik. 43. Under the former practice in this court, before the right of review was taken away, the party, upon review in this court, was allowed, as matter of right, to reargue the same questions of law, if he chose. *Hazen* v. *Smith*, 2 Tyler, 59; *Chipman* v. *Sawyer*, *id.* 61. But since the adoption of the present system, in 1825, when jury trials and reviews in this court, were abolished, and only questions of law revised here, and by parity of reason, when in 1840 a similar practice was established, in regard to chancery appeals, it was deemed incumbent upon the court to make every decision of a question of law, conclusive upon the particular case. Other cases may be found in the reports. No such question has been moved in this court for many years, the practice has been regarded as so fully settled. We never refuse to make the mandate conform to the decision of this court, when there has been any accidental omission, or mistake, which appears from the opinion of the court, which is not the present case.