THOMAS SNELL *et al.*

*v.*

J. B. BROWN *et al.*

71   133
120   439
71   133
134   208
71   133
40a   242
71   133
158   437
71   133
76a   375
71   133
205   ³459

1.  CONTRACT—*third person to make estimates and determine quantity and quality.* Where a contract for grading and work on a railroad provided that the work should be done under the direction and supervision of the

Syllabus.

chief engineer of the company, and his assistants, by whose measurements and calculations the quantities and amounts of the several kinds of work should be determined, and whose decision should be conclusive: *Held*, that a measurement by an assistant engineer, estimating the embankments made by the contractors, was not conclusive upon the employers that the work was done according to the contract, and that the contractors were entitled to pay for the price thereof.

2. Where a party voluntarily enters into a contract that a third person shall measure and estimate the work done, and pass upon its quality, with power to reject and condemn all work and materials which, in his opinion, do not conform to the spirit of the contract, he can not evade or disregard it, except for fraud clearly proved.

3. Where parties agree to abide by the estimates of a third person, as to the quantity of work done, and his decision whether it is according to the contract, the estimates of such person may be set aside for fraud; but fraud can not be presumed merely because his estimates for work done pursuant to the contract are less than the measurement of the work actually done. A mistake or error of judgment, in condemning some of the work, affords no ground to impeach his estimate.

4. The fact that more work was done than is included in the estimate, may be shown as a circumstance tending, in some degree, to establish fraud, but it is not conclusive. The evidence must show that such party knowingly and wilfully disregarded his duty, and rejected or condemned work which he knew, or at least should have known, fully conformed, in all respects, to the contract.

5. Where a contract to perform certain work provides that a suspension of the work by the employer shall give the contractor no claim for damages, etc., a suspension of the same, in good faith, will not relieve the contractor from his undertaking to abide by the award of an engineer as to the quantity and quality of the work done.

APPEAL from the Circuit Court of Cook county; the Hon. JOHN G. ROGERS, Judge, presiding.

Messrs. LAWRENCE, WINSTON, CAMPBELL & LAWRENCE, for the appellants.

Messrs. HERVEY, ANTHONY & GALT, and Mr. HENRY CRAWFORD, for the appellees.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

This was assumpsit, brought by appellees against appellants, on a contract for the construction of that portion of the Decatur and State Line Railroad from section 104 to section 130 inclusive.

By the terms of the contract, appellees undertook to do the grubbing, clearing. excavating, grading, including the furnishing of materials and everything necessary to prepare the road-bed for the superstructure. Work was to be commenced in ten days, and completed, in conformity with certain specifications annexed to and made part of the contract, by the 16th of November, 1871, except section 104, which was to be completed by January 1, 1872.

Appellants were to pay appellees—

For clearing, per 100 feet, $4.

For grubbing, per 100 feet, $5.

For embankment, per cubic yard, $17\frac{1}{2}$ cents.

For excavation of loose rock, per cubic yard, 70 cents.

For excavation of slate rock, per cubic yard, $1.

For excavation of solid rock, per cubic yard, $1.25.

It was provided by the specifications that—

"Earth excavation will include all loose stones and other materials of every description, as found, and which are not included in the specifications as solid, slate or loose rock.

 *  *  *  *  *  *  *

"Earth, rock and all other materials taken from excavations, except when otherwise directed by the engineer, shall be deposited in the adjacent embankments, the cost of moving which, when the distance does not exceed 1,500 feet, will be included in the price of embankment; also, all materials necessarily procured from without the road-bed and deposited in the embankment, will be paid as embankment only.

"In procuring materials for embankments from without the road-bed, the place will be designated by the engineer,

and, in excavating it, care must be taken to injure or disfigure the land as little as possible.

"Materials necessarily wasted from the cuttings will be deposited in the vicinity of the road, according to the directions of the engineer."

It was also provided that "the work should be executed under the direction and supervision of the chief engineer of said railroad company, and his assistants, by whose measurements and calculations the quantities and amounts of the several kinds of work performed under this contract should be determined, and whose determination should be conclusive upon the parties, and who should have full power to reject or condemn all work or materials, which, in his or their opinion, did not fully conform to the spirit of this agreement; and further, that said chief engineer should decide every question which could or might arise between the parties, relative to the execution thereof, and his decision should be final and binding upon both parties thereto."

Monthly estimates were to be made of the work done and materials furnished, during the progress of the work, and the amount thereof, less fifteen per cent, which was to be deducted and retained by appellants until the completion of the work, was to be paid by appellants upon the certificate of the engineer at Chicago. When the contract should be fully performed and the engineer should have certified the same in writing, appellants were to pay appellees, within ten days, what should then remain due, including the fifteen per cent deducted from the monthly estimates.

Appellees entered upon the work, and continued to prosecute it until the 11th of October, 1871, when it was suspended, in consequence of losses supposed to have been sustained by appellants in the great fire at Chicago. There is some conflict in the evidence whether the work was then suspended by order of the appellants or by the mutual consent of the parties. The fact, however, is undisputed that the

work was then suspended, and that it has not been since resumed by appellees.

The declaration alleges that appellees had, from the time of the execution of the contract until stopped by appellants, observed the contract in every respect, according to its tenor and effect; that they would have completed the whole work according to the contract, if they had not been stopped by appellants; that, before the 11th day of October, they did work on sections 104 to 130 inclusive, to the amount of 137,140 cubic yards, for which a large sum of money is due them; that appellants did not perform their part of the contract, but delayed and hindered appellees while at work, up to October 11, when they stopped the work, and did not nor would suffer appellees to complete the contract, and then and there wrongfully discharged appellees from any further performance or completion of the work; that appellants, further disregarding their agreement, have returned, by the engineer on said work, incorrect estimates of amount of work done, and have procured said engineer to make incorrect estimates of the amount of work done, and have refused to pay appellees for work so done, etc.

Appellants pleaded, first, *non assumpsit;* second, that the chief engineer of said Decatur and State Line Railroad Company, in the contract mentioned, made estimates, as provided in the contract, all of which were duly paid; third, that all matters of difference between appellants and appellees were, by the terms of the contract, to be decided by the chief engineer of said railway company, and that said engineer did decide that, at the time when, etc., defendants owed plaintiffs, for work done under said contract, $11,165.18, and no more, which had been fully paid; fourth, that, about October 11, 1871, appellants, under and by virtue of the terms of said contract, suspended work thereon, and, on January 11, 1872, notified plaintiffs to resume the work, and complete the contract, which appellees have wholly refused to do, whereby appellants have suffered damages and loss to the amount of

$65.000, of which said sum appellants are willing to recoup plaintiffs' damages; fifth, that, before the commencement of the suit, on January 11, 1872, appellees abandoned the work, leaving half undone, to be finished by appellants.

Appellees replied to the second plea, that the chief engineer in said plea mentioned did not, during the progress of the work, make estimates for the labor and materials, according to the contract, but falsely, knowingly and fraudulently, and at the request and by the instigation of appellants, furnished to appellants, about November 10, 1871, a false, fraudulent and incorrect estimate of the amount of work done and materials furnished by appellees, underestimating the quantity and value about one-half; that appellants procured such engineer so to estimate, for the purpose of cheating and defrauding appellees; that, although the estimate of November 10 was paid, appellants have not paid for the work and labor done by appellees according to the contract. Appellees also further replied to said plea, that the chief engineer was, by the contract, required to give just, true, faithful and correct estimates, etc.; that, in the estimate of November 10, 1871, said chief engineer so carelessly, insufficiently, negligently and incorrectly made said measurements, that said estimate showed but about one-half of the true amount, and that appellees have never been paid for the excess over said estimate.

This reference to the pleadings sufficiently shows the issues submitted to the jury.

There is no controversy as to the quantity of work actually done by appellees, nor that the chief engineer did not, in his estimate of November 10, 1871, allow appellees for anything like the full amount the quantity done, if it was done in conformity with the terms of the contract, would come to. It is claimed by appellants that appellees, contrary to the instructions of the chief engineer and the terms of the contract, wasted earth, in taking out excavations, which should have been placed in embankments, and borrowed earth for

making embankments, which should have been made from earth taken from excavations; that appellees "skinned the work," as they phrase it—that is, did only such as could be done with profit, and left undone such as was attended with loss; that the work actually done would cost considerably less than the contract price, while that left undone would cost considerably more.

This was denied by appellees, and they claimed, also, that they had been delayed and put to much unnecessary expense on account of the failure of appellants to obtain right of way.

The evidence was conflicting, and tended, on each side, to sustain the claims made by the respective parties.

The questions of law involved are fully presented by the first instruction given at the instance of appellees, and the fourth instruction asked by appellants, which was refused by the court.

The first instruction given at the instance of appellees is as follows:

"1. If the jury find, from the evidence, that the contract declared on was made, and that, acting under its provisions, the assistant engineers of the Decatur and State Line Railway Company fully and honestly measured and estimated the embankment made by the plaintiffs, and officially returned that there were 137,140 cubic yards thereof, the court, on such facts, if found, charges the jury that such measurement and official estimate and return was a full and conclusive acceptance and approval of the entire amount so estimated, and that the chief engineer had no lawful right, under the contract, to alter such estimates or nullify their effect, or in any manner to deprive the plaintiffs of the full benefit of such estimates as to the actual number of cubic yards in the embankment made by the plaintiffs."

And this is the fourth instruction asked by appellants, but refused by the court:

"4. The jury are further instructed that, in making an estimate of work done under said contract, it was the duty of said engineer to take into consideration the *quality* as well as the quantity of the work done, and if the estimates in question were fairly made, considering *quality* as well as *quantity*, they are binding upon both parties to said contract."

In conformity with this view of the law, the court refused to allow the witness Taylor to answer the question, "How much more is it worth to do the work undone than the work already done?" and, for a like reason, the witness Carter, the chief engineer, was not permitted to answer the question, "State, after these returns were made, how much of the work you accepted as performed in accordance with the contract?"

In these rulings, it is assumed by the court that the fact that the assistant engineers found, by measurement, that appellees had done 137,140 cubic yards of work, is conclusive evidence that appellees are entitled to pay for the same, and that the estimate of the chief engineer, estimating and allowing them only for 75,059 yards, is fraudulent *per se*, and incapable of explanation. We are unable to yield our assent to this construction of the law, as applied to the case before us.

It is unnecessary to discuss the authority of the assistant engineers to make estimates, under the contract, or whether they would be final and conclusive upon the parties, when made. The contract requires all estimates, upon which payments are to be made by the appellants, to be upon the certificate of the engineer at Chicago. The measurement made by the assistant engineers was not certified as an estimate by them, but the result was merely forwarded to the chief engineer. There is no question made but that their measurement was correct, and that their report accurately indicated the quantity of work done by appellees; but because this quantity of work was done, it does not necessarily follow that it was done in conformity with the terms of the contract.

Appellees, as we have seen, were required, in making excavations, except when otherwise directed by the chief engineer, to deposit the earth removed in the adjacent embankment, and the cost of moving such earth, when the distance did not exceed 1500 feet, was included in the price paid for embankment. Suppose, therefore, to illustrate, instead of observing this requirement, appellees had wasted, in a given case, say 50,000 yards of earth taken out of an excavation, although there was an adjacent embankment of 50,000 yards to be made, but which they did not construct; and, in another case, they make an embankment of 50,000 yards, from borrowed earth—that is, earth taken from the sides of the road, notwithstanding there is an adjacent excavation of 50,000 yards to be made, but which they have left untouched. An accurate measurement of the excavation and the embankment would show 100,000 cubic yards of work done by appellees; yet it is perfectly plain that appellants would lose one-half that they are entitled to, under the contract, by this estimate, for the embankment and excavation left to be made would cost just as much as, in the first instance, under the terms of the contract, the entire excavation and embankment would have cost. The illustration sufficiently shows that, in all cases where earth taken from excavations, which should have been placed in embankments, was wasted, or borrowed earth was put in embankments which should have been made from excavations, and the adjacent excavation or embankment was left unfinished at the time of the measurement, appellants would suffer loss to the extent that earth had been thus unnecessarily wasted or borrowed. This would not, of course, apply to borrowed earth which would be necessary to supply the deficiency in the earth to be taken from an adjacent excavation to complete a given embankment, nor to earth taken from excavations and wasted in excess of what was required for adjacent embankments; nor could it apply to cases where the adjacent excavations and embankments were fully completed, for the measurement there would be made upon the

assumption that the terms of the contract, in this respect, had been observed.

When appellees quit work, there were, according to the evidence, about 150,000 cubic yards of excavation and 250,-000 cubic yards of embankment yet to be made, and this was not in a continuous, unbroken line, but was made up from quantities here and there, with intervals of completed and partially completed work.

It can not be true, therefore, that appellees were, by the terms of the contract, entitled to have 137,140 cubic yards estimated to them for payment from the simple fact alone that they had done that amount of excavation and embankment, in the aggregate. Under the supposed case given as an illustration, they would have been entitled to an estimate of but one-half that amount.

By reverting to the provisions of the contract, relating to measurements and estimates, it will be recollected that the work was to be executed under the direction and supervision of the chief engineer and his assistants, by whose measurements and calculations of quantities and amounts the several kinds of work performed under the contract should be determined, and whose determination should be conclusive upon the parties, and who should have full power to reject or condemn all work or materials which, in his or their opinion, did not fully conform to the spirit of the contract.

This may seem to be unfair and oppressive towards appellees. It is, nevertheless, their own contract, voluntarily entered into, and they can not evade or disregard it, unless for fraud, clearly proved. *Canal Trustees* v. *Lynch*, 5 Gilm. 521 ; *Herrick* v. *Vermont Central Railway Company*, 27 Vt. 673.

Notwithstanding, therefore, the returns made to the chief engineer by his assistants, if he believed any portion of the work embraced in those returns was not done in conformity with the terms of the contract, he was not only empowered, but it was his duty to condemn or reject so much of it. He would have been unfaithful to the trust reposed in him, had

he certified for payment an estimate for work which he knew
was not done in conformity with the terms of the contract.

It is true, his conduct may be impeached, and his estimates set
aside for fraud; but fraud can not, as is assumed in the instruc-
tions for appellees, be presumed merely because his estimates
for work done pursuant to the terms of the contract are less
than the measurement of the quantity actually done.    Even
if he, by mistake in judgment, erred in condemning or reject-
ing work, it would be no ground to impeach his estimate.
*Herrick* v. *Vermont Central Railway Company, supra.*

To prove that the estimate is fraudulent, it is not sufficient
merely to show that work was rejected or condemned, which,
in the opinion of others, should not have been rejected or
condemned.    This may, indeed, be proved as a circumstance
tending, in some degree, to establish fraud, but it is not con-
clusive.    The evidence must show that the engineer know-
ingly and wilfully disregarded his duty, and rejected or con-
demned work which he knew, or at least should have known,
fully conformed, in all respects, to the terms of the contract.
In determining this question, evidence is admissible of the
character of the work to be done, in the first instance, the
quantity and character of the work actually done, and also
of that undone.

The fact that work was suspended by order of appellants,
even if it be conceded that it was so suspended, does not
relieve appellees from their obligation to submit to the award
of the chief engineer and his assistants; and the parties ex-
pressly agree, by their contract, in these words:

"4.    It is further mutually agreed between the parties
hereto, that nothing herein contained shall be construed into
a liability for damages on the part of the second party hereto,
should the whole or any part of the work under this contract
be, for any reason, suspended or delayed; and in no event
will the party of the first part have a right to claim extra
compensation, or price, for damages arising from such suspen-
sion or delay of said work."

There is no pretense that the suspension of work on the 11th of October, 1871, was done for a fraudulent purpose, or with any view to injure appellees. It was induced by an overwhelming calamity, seriously affecting the solvency of appellants, at a time when the extent of their loss was not fully known. It was dictated by prudence, and the good faith of appellants, in this respect, is not questioned.

The judgment of the court below is reversed, and the cause remanded for further proceedings not inconsistent with this opinion.

*Judgment reversed.*