## DRHEW & BELL v. ALTOONA CITY.

ERROR TO THE COURT OF COMMON PLEAS OF BLAIR COUNTY.

Argued April 18, 1888—Decided October 1, 1888.

(*a*) Under a contract with a municipality for the construction of the reservoir of a water works, the work was to be done under the direction and subject to the approval of the city engineer, whose decision in all questions or matters relating thereto should be final and conclusive without appeal.

(*b*) The reservoir was to be completed within a specified time, and to this end the engineer had power to employ additional force if necessary at the expense of the contractors, and to stop the work under the contract when in his judgment the best interests of the city might require it.

(*c*) The contractors were to be paid during the progress of the work, upon monthly estimates by the engineer of the relative value of the work

done, but with 15 per cent retained till completion. when the balance ascertained by the final estimate of the engineer upon his measurement of the whole was to be paid.

(d) Said final estimate was to be made of the quality, character, and value of the work, according to the terms of the contract, and any disagreement upon any matter or thing arising from the specifications or drawings, or the contract, or the kind or quality of the work required, should be decided by the engineer, whose decision and interpretation should be final and conclusive.

(e) Before completion, default was made in payment of a monthly estimate. Eight days thereafter. the contractors stopped work and demanded final estimates up to that date, which were not furnished; they then brought suit. Afterwards the engineer made a final estimate, which, however, in classification and prices of certain work did not conform to the terms of the contract.

(f) On the trial of the suit, the plaintiffs claimed to recover, not only the value of the work done to the date of stopping but damages occasioned by the breach of the contract in addition; the defendant replied that the fund, raised by loan and specifically appropriated, was exhausted, and that the city indebtedness already exceeded the constitutional limit. *Held*:

1. That on default of the city to pay during the progress of the work, according to the monthly estimates, a right of action accrued to the contractors against the city for the recovery of the amount due them.

2. That the final estimate made after suit begun, so far as it fell within the scope of the submission in the contract, was to be treated, not as evidence merely, but as an adjudication under the contract and therefore final and conclusive.

3. But, in so far as the engineer by his final estimate undertook to insert into the contract terms to which the parties had not agreed, his action was ultra vires and not conclusive.

4. That an instruction that the plaintiffs were entitled to be paid what was due them under the contract up to the time when they had notice that the fund was exhausted, was as favorable as they could ask, as the case was presented on the record.

Before GORDON, C. J., PAXSON, STERRETT, GREEN, CLARK and WILLIAMS, JJ.; TRUNKEY, J., absent.

No. 59 July Term 1887, Sup. Ct.; court below, No. 48 January Term 1883, C. P.

On November 23, 1882, P. F. Drhew and G. T. Bell, trading as Drhew & Bell, brought an action of covenant against the city of Altoona. The plea was, covenants performed absque hoc, and payment.

At the trial on January 28, 1884, one of the plaintiff firm

having died since the suit was brought, the material facts appearing were as follows :

On August 11, 1880, at a special meeting of city council, a resolution was passed that the committee on water pipe be and they were thereby instructed to purchase water pipe, hydrants, and materials needed for the laying of the same, in such quantities and at such times as they might deem proper, said purchase not to exceed in the aggregate the sum of $15,000.   On October 2, 1880, an ordinance was enacted " authorizing a loan of $60,000, for the building of dams for water storage, and for the purchase and laying of water pipe " for the use of the city, and it was provided that all moneys derived from the sale of the bonds authorized should be used "for the building of reservoirs for the storage of water for the use of said city, and for the purchase and laying of water pipe through the city, and for that purpose only."

On August 3, 1881, the plaintiffs entered into a sealed contract with the city to furnish all the material and perform all the labor necessary to complete in the most substantial and workmanlike manner, to the satisfaction and acceptance of the engineer of said city, the reservoir and storage dam at Kittanning Point; the work to be finished as described in the specifications, made a part of the contract, and agreeably to the directions received from the engineer in charge, or his assistants, on or before August 31, 1882.   Certain provisions of the contract were as here follow :

The quantities exhibited to the contractors at the time of soliciting proposals for the work herein contracted for are necessarily only approximate ; they furnish only general information, and will in no way govern or affect the final estimate, which will be made out on the completion of the work from actual measurements and established facts not determinable at the time of letting the work.

On or about the last day of each month during the progress of this work, an estimate shall be made of the relative value of the work done, to be judged of by the engineer, and eighty-five per cent of the amount of said estimate shall be paid to the party of the first part on or about the first day of each month.   And when all the work embraced in this contract is completed, agreeably to the specifications, and in accordance with the directions and to the satisfaction and acceptance of the engineer and city council, there shall be a final estimate made, of the quality, character and value of said work according to the terms of this agreement, when the balance appearing due to the said parties of the first part shall be paid to them within thirty days thereafter, upon etc. . . . . .

### Statement of Facts.

It is further agreed and understood, that the work embraced in this contract shall be commenced within five days from this date, and prosecuted with such force as the engineer shall deem adequate to its completion within the time specified, and if at any time the said party of the first part shall refuse or neglect to prosecute the work with a force sufficient, in the opinion of the said engineer, for its completion within the time specified in this agreement, then, and in that case, the said engineer in charge, or such other agent as the engineer shall designate, may proceed to employ such a number of workmen, laborers and overseers as may, in the opinion of the said engineer, be necessary to insure the completion of the work within the time hereinbefore limited, at such wages as he may find it necessary or expedient to give; . . . . .  The engineer in charge shall have the right to cause the stoppage of the work at any time when in his opinion the best interests of the city shall require it, and the work shall not be recommenced without the permission of the engineer in charge. . . . .

Also that any disagreement or difference between the city and the contractors upon any matter or thing arising from these specifications or the drawings to which they refer or to the contract for the work or the kind or the quality of the work required thereby, shall be decided by the engineer in charge, whose decision and interpretation of the same shall be considered final, conclusive and binding on all parties. . . . .

Every part of the work is to be executed under the direction and subject to the approval of the engineer in charge, and it is understood that in all questions or matters relating either to the work or the contracts for the same, the decision of the engineer in charge shall be final and conclusive and without appeal.

And the said party of the second part doth promise and agree to pay to the said parties of the first part:

For grubbing and cleaning a site of reservoir, per acre.......$30 00
  "    material placed in embankment, per cubic yard.........   32
  "    earth excavation............   "    "    "  .........   35
  "    rock excavation............   "    "    "  ........   75
  "    brick laid in cement mortar per 1,000..... ............ 16 00
  "    puddle laid in cement mortar, per cubic yard............  1 15
  "    broken stone top dressing-embankment, per cubic yard..  1 00
  "    paving in waste weir.................   "    "    "  ..  2 00
  "    cut stone masonry in pier...... ......   "    "    "  .. 10 00
  "    cut stone masonry in overflow.........   "    "    "  .. 10 00
  "    rock range masonry,................   "    "    "  .. 10 00
  "    rubble masonry............. ........   "    "    "  ..  3 75
  "    rip-rap......................... .....   "    "    "  ..  1 25
  "    hemlock plank per 1,000 in place...................... 23 00
  "    excavation of ditch from overflow, per cubic yard.......   40
  "    building sewer per foot...................... ......... 4 50

In witness whereof . . . .

Under said contract the work was begun and prosecuted for

fifteen months, the contractors receiving monthly estimates, deducting the 15 per cent to be retained. The fifteenth estimate was made on November 1, 1882, and was as follows:

| | | |
|---|---:|---:|
| For clearing 35 acres, at $30 | $ 1,050 | 00 |
| " extra work on test holes | 54 | 25 |
| " extra work hauling stone off slope | 94 | 16 |
| " 33,178 cubic yards earth excavation, at 35 cents | 11,612 | 30 |
| " 32,784 cubic yards embankment, at 32 cents | 10,490 | 00 |
| " 248.5 cubic yards ditching, at 40 cents | 99 | 40 |
| " 11,067 cubic yards rock excavation, at 75 cents, | 8,300 | 25 |
| " 1640 cubic yards puddle, at $1.15 | 1,886 | 00 |
| " 396 cubic yards cut masonry, at $10 | 3,960 | 00 |
| " 1170 cubic yards rubble masonry. at $3.75 | 4,387 | 50 |
| " 62,000 bricks laid at $16 | 992 | 00 |
| " 7 lineal feet of sewer, at $5.75 | 40 | 25 |
| " 606 cubic yards rip-rap, at $1.25 | 757 | 50 |
| " 210 cubic yards broken stone, at $1 | 210 | 00 |
| Total | $43,934 | 49 |
| Less 15 per cent | 6,590 | 17 |
| | $37,344 | 32 |
| Less previous pay | 32,670 | 63 |
| Balance due | $4,673 | 69 |

For the amount of this balance an order was drawn in favor of the contractors upon the treasurer of the water fund and presented for payment on November 7th, following. The treasurer informed Mr. Drhew, who presented the order, that the water fund, which had originally been $60,000, was exhausted except the sum of $2,410. The order was then returned and three orders were given in place of it, one for $2,410, and two others, for $1,090 and $1,113.69, respectively. The first of these orders, that for $2,410, was paid, the others remained unpaid.

The contractors continued under the contract until November 8, 1882, when they stopped, disposed of their implements, horses and other property, and formally abandoned the work. The city engineer was then requested by the contractors to furnish a final statement showing the amount of work, etc., done, and the sum due the contractors to the time of their quitting work. This the engineer declined to do, and the con-

Charge of Court below.

tractors thereupon brought this suit. Subsequently, on December 15, 1882, the following final estimate was made by the engineer, including the work, etc., done to November 8th:

ALTOONA WATER FUND.

1882.                                   To DREHEW & BELL, Dr.

| | | |
|---|---|---:|
| Dec. 15, | To 30 acres of clearing at $30..................... $ | 900 00 |
| " | " Extra work on test holes...................... | 54 25 |
| " | "    "    " hauling off slope.................. | 94 16 |
| " | " 18,063.4 cubic yards earth excavation at 35c.... | 6,322 36 |
| " | " 14,779.1 cubic yards of loose rock excavation at 50c......................................... | 7,389 55 |
| " | " 5,201.6 cubic yards solid rock excavation at 75c. | 3,901 20 |
| " | " 2,701.6 cubic yards of above, extra pay for picking, 55c.................................... | 1,485 88 |
| " | " 26,817.9 cubic yards embankm't at 32c......... | 8,581 73 |
| " | " 248.5 cubic yards ditching at 40c............. | 99 40 |
| " | " 1,846.3 cubic yards puddle at $1.15........... | 2,123 25 |
| " | " 1,154.1 cubic yards rubble masonry at $3.75.... | 4,327 87 |
| " | " 391.1 cubic yards cut masonry at $10.......... | 3,931 00 |
| " | " 62,000 bricks laid at $16 per M............... | 992 00 |
| " | " 13 lineal feet of sewer at $5.75............... | 74 75 |
| " | " 599.7 cubic yards rip-rap at $1.25...... ...... | 749 62 |
| " | " 210.2 " " broken stone at $1........... | 210 20 |

| | |
|---|---:|
| Total ................................ ...............$ | 41,237 22 |
| Less orders granted................................. | 37,344 32 |
| Balance.............................................$ | 3,892 90 |

The contentions of the parties appear in the charge of the court, DEAN, P. J., parts of which were as follows:

Up to this time [November 8, 1882] the plaintiff alleges, the contractors had faithfully kept the covenants on their part; had prosecuted the work diligently and had done it well; and, while they had not finished it on or before August 31, 1882, as specified in the agreement, the plaintiff alleges this was owing to a large increase in the quantity of the work over that specified or intended at the time the contract was entered into, by reason of deeper excavations and a change in the slope of the embankment, which largely increased the amount of work to be done. So far as the evidence shows, no complaint was made by the city because of this delay; the work was conducted on through September and October under the city

engineer in charge, and estimates were made by him as if there had been no breach of the contract in this particular on the part of the contractors. The plaintiff alleges that the city having delayed the work and treated the contractors as if they had not failed in the performance of their part of the contract in this particular, the defendant has no right to insist on the completion of the contract within the stipulated period. If you find that there was no failure; that the contractors kept their covenants in this particular; that any failure which did occur was caused by the enlargement or increase of the work under the direction of the city engineer, and the delay was consequent upon that, that would excuse performance on the part of the contractors within the stipulated time. Or if you find that the defendant after August 31, 1882, went on and treated the contractors as if no advantage would be taken of the failure to complete the work on or before that date, you may find from the conduct of the defendant that there was a waiver on its part of strict performance in this particular; and the plaintiff could, so far as that part of the contract is concerned, claim payment under it. . . . .

The defendant covenanted to pay, on or before the first day of each month, 85 per cent of the estimate of the preceding month made on or before the last day of the month. Fifteen per cent was to be retained as security for the faithful performance of the contract on the part of the contractors; and fifteen per cent of the estimates up to the time of the making of the fifteenth estimate had been retained accordingly. The evidence is undisputed that the defendant did not pay $2,263.69, the amount of the two orders spoken of, of the amount due for October. The city did not pay because it had not the money. It is conceded that the city did not pay this amount because the payment of the order for $2,410 had taken the last of the $60,000 which had been provided for the purpose of building the reservoir and laying pipes. The legal power of the city to replenish this fund was exhausted. This was not a temporary interruption of payment, occasioned by delay in the collection of the taxes or other like causes which time might have cured; it was a barren treasury without hope of fruitfulness in the immediate future. The plaintiff alleges that this failure of the defendant resulted in pecuniary embarrassment to the con-

tractors; that they were forced to pledge the dishonored orders for temporary loans to meet claims for labor and other debts incurred in the prosecution of the work under the contract and that, under the circumstances, they were unable to further prosecute the work. . If you find the facts alleged by the plaintiff, then this failure of the defendant to keep its covenants relieved the contractors from the further prosecution of the work under the contract, and they had the right to bring suit to recover whatever damages the defendant is legally answerable for under the contract in evidence. The law does not require them, under such circumstances, to go on with the work and complete it before a suit can be sustained.

The plaintiff is entitled to recover the value of whatever work the contractors performed under the contract up to the time it was broken by the defendant. This value is to be ascertained in the mode and at the prices settled in the contract. We have read to you the prices the contractors were to get for the different kinds of work to be done by them. You will notice that by the contract, as it was read to you, monthly estimates were to be made by the engineer. . . . . The estimates are matters relating to the value and quantity of the work under the contract, and his decision is embodied in the estimate. Every month he made an estimate, relatively of course to the final one which was to be made on the completion of the work. Relative estimates were to be made and his decision was to be final and conclusive as to them, until the final estimate was made. The monthly estimates which the engineer made, have been read to you; they were made for some fifteen months, and number from one to fifteen inclusive, commencing with August 2, 1881, and ending with November 1, 1882, making a total value of $43,934.49. Another estimate, including the work done between the 1st and 8th of November, 1882, was made by him, in which there was included the entire work done from the commencement to the conclusion of the work, which amounts, in all, to $41,237.26, or a difference of $2,697.23, being that amount less than the aggregate of all the estimates up to the first of November, with the eight days in November added. The contract provided for an estimate to be made each month approximately of the amount and value of the work done each month with

relation to that done before. The difference of $2,697.23, seems to arise from the following items: . . . . .

The plaintiff alleges that the last estimate, called " The Final Estimate," was in no sense an estimate under the contract, and is not as conclusive as to the judgment or decision of the engineer, as Estimate No. 15 ; that it was made after the city had broken its covenant and forced the contractors to abandon the work, was not made in their presence or delivered to them, and that the engineer refused to make it at Mr. Drhew's request. We instruct you, that, as the estimate was made within a reasonable time after the work stopped, it must be treated as made in pursuance of the contract. It was not necessary that it should be made in the presence of the contractors·; nor was it necessary, under the contract, that it should be delivered to them. There is evidence here tending to show that the engineer declined to make it when requested by Mr. Drhew, but that he did make it to satisfy the other party to the contract. There is also evidence that the president of the council had notice that the contractors had stopped, or intended to stop, the work. If the engineer was requested to make an estimate and declined to do so, the contractors could institute suit; but they could not thereby deprive the city of the judgment of the engineer in estimating the amount of work done. The work did not stop because of any neglect of the engineer; . . . . But the estimate was made by the city engineer and delivered to the defendant. It was made, too, as he testifies, in pursuance of the contract; it is of such weight, we instruct you, as any other estimate made by him, in view of the evidence here. . . . .

The contract has but one classification of rock excavation; it says 75 cents a cubic yard. The witnesses of both the plaintiff and defendant agree that in excavations there are generally four classifications, solid rock, loose rock, hard-pan, and earth. The plaintiff alleges that there is not any earth here classified as rock at 75 cents per cubic yard, under this contract; or rather that all kinds of rock should be classed as rock whether loose, solid, or harder than common earth excavation. The defendant alleges that everything not solid rock should be classified as common excavation. There is nothing in the contract which warrants us in saying that either is right. From

the evidence there were four classes of excavation, though but two in the contract, rock and earth; but the contract provides that "any disagreement or difference between the city and the contractors upon any matter or thing arising from these specifications, or the drawings to which they refer, or to the contract for the work, or the kind or quality of work required thereby, shall be decided by the engineer in charge, whose decision and acceptation of the same shall be considered final, conclusive, and binding on all parties." He has, in his final estimate, decided that this excavation shall be classified as loose rock at 50 cents per cubic yard, 14,774.1 cubic yards; and that there shall be allowed extra for picking, instead of blasting, 2,701.6 cubic yards of a harder substance, at the rate of 55 cents per cubic yard; and so far as the classification is concerned, the decision of the city engineer must control in the absence of plain mistake or fraud; as it must also as to quantity. . . . .

As a general rule when one party to a contract, before the completion of it, breaks his covenant, he is answerable in damages to the other party, not only for the loss sustained by the sudden stoppage of the work, such as loss of material, depreciation in the value of machinery, etc., but also for the actual profits which he would have made, had the contract been completed as originally intended. This rule will apply to natural persons or private corporations; but it does not follow that it applies to municipal corporations such as the city of Altoona, under the circumstances here in dispute. The people constitute the municipality; the council, mayor, and other officers are but its agents through whom it acts. The city's power to act is fixed and circumscribed by law. The extent of its indebtedness, and necessarily the extent of its expenditures, are limited by law. Here it is conceded that before this contract was made, a loan to the amount of $60,000 had been negotiated; the money was either in the treasury or very soon would be; and, whether this loan was an increase of the indebtedness of the city beyond the legal limit or not, it is not disputed that there could be no further increase of the debt by law for any purpose. This loan, by resolution of council, was made for the express purpose of building water reservoirs and laying pipes. No definite division of the fund for the two purposes was made. There was no legal declaration on the part of the city as to how much

Charge of Court below.

should be appropriated for one purpose and how much for the other. Fifteen thousand dollars was, by resolution, appropriated for water pipes; but there was no declaration that this was all that would be appropriated for such purpose, or that $45,000 was to be appropriated for the reservoir. Here was $60,000 for the reservoir and pipes, subject to future appropriation of council in such amounts as they saw proper. The council might legally have appropriated $10,000 to cover the expenses of purchasing and laying the pipes and $50,000 to the building of the reservoir; it might have appropriated one half of the $60,000 to the reservoir and the other half to the pipes; or it might legally have increased the $15,000 appropriated to pipes, to $20,000. If it had, what was left would have been all that it would have afterwards expended for work on the reservoir. Drhew & Bell and all other persons contracting with the city of Altoona are bound to know the law which limited the debt of the city. . . . . .

This may seem a harsh rule in this particular instance, but it is the law; the plaintiff might, perhaps, have provided against it by a stipulation in the contract, requiring the city to set apart a fixed portion of the $60,000 for the payment of the work of the reservoir under the contract. The council, perhaps, would have had the right, by ordinance, to divide the fund and thus make the city answerable to the extent of a definite portion of it; but there is no such stipulation in the contract; and we instruct you that up to the time they had notice that the fund was exhausted, which was on the 7th or 8th of November, when they presented their order to Mr. Lloyd, they are entitled to be paid whatever was due them under the contract. And we further instruct you that they were bound to assume, when they took the contract, that such a contingency might happen at any time, during the progress of the work, that they might get notice that the fund was exhausted; and they cannot here recover for any loss which they were bound to assume might happen without any illegal act or wrong whatever, and which could only be prevented by raising money illegally. They can recover no damages arising from the sacrifice or depreciation of materials or implements, and nothing for profits which they might have made, had they completed the work; and such seems to have been the view of the

parties at the time they made this contract, for it is stipulated that the engineer in charge shall have the right to cause a stoppage of the work at any time, when in his opinion the best interest of the city shall require it. The engineer did not stop the work, but the city did, by notifying the contractors that there was no more money with which to go on.

We say to you that under the instructions we have given you the plaintiff cannot recover more than for the work actually done, estimated by the engineer in the official estimate, deducting the orders. If the orders had been paid there would have been a balance of $3,892.99, to which add the orders unpaid and pledged by Drhew, $2,263.69. The plaintiff has a right to recover also for whatever materials the contractors left on the ground which the city appropriated to its use, amounting, as it is claimed the evidence shows, to $320.54; this amount however, is for your determination; leaving the actual amount or balance, as the plaintiff claims, of $6,366.83. . . . . . This sum, $6,366.83, is all of the plaintiff's claim that can be submitted to you subject to the evidence on the part of the defendant. The defendant claims that there is nothing due.

The plaintiffs have requested the court to charge :

1. That if Mr. Seabrook, the city engineer, was requested by Patrick Drhew to make an estimate of the work done by the plaintiffs up to November 8, 1882, and he refused so to do and to decide upon the amount due the plaintiffs, they had the right then to bring this suit.

Answer : The evidence shows, if John Patton, Thos. Seabrook and Frank Molloy be believed, that Drhew, immediately after the default in payment on the October estimate, notified the president of council of their intention to abandon the work, and also requested the engineer to estimate the work done from the 1st to 8th of November. It was the duty of the city, when notified of the abandonment of the contract, to have the estimate made; it was the duty of the engineer, when requested, to make the estimate; the contractors were not bound to defer suit for whatever was legally demandable under the contract, because the engineer delayed or refused to perform promptly the duty imposed on him under the contract; their right to bring suit did not depend on his con-

venience or inclination. They waited until November 23d, fifteen days after the default in payment. If you find they requested the engineer to make an estimate of these eight days' work and he neglected or refused to make it, the suit was not prematurely brought, and the point is affirmed. While the point is affirmed, you are to give to the final estimate made on December 15th the same effect as if made before suit was brought; the bringing of the suit did not divest him of his functions under the contract, even though he delayed in performing them.[1]

2. The estimate of November 1, 1882, is conclusive of the amount due the plaintiffs for work done to that date, and the plaintiffs are entitled to a verdict for the amount due on said estimate, together with such further sum as may be allowed by the jury for work done from the 1st to the 8th November, if the defendant wrongfully withheld payment of said estimate on November 8th, and thereby obliged the plaintiffs to stop their work.

Answer: Denied.[2]

3. If the court declines the first point, then, under the same conditions, the estimate of Mr. Seabrook made for the city on December 15, 1882, is conclusive on the city as to the quantities of work done, and the plaintiffs are entitled to recover the same, according to the contract price named in the contract.

Answer: Denied.[3]

4. If the court decline the last point then the estimate No. 15 should be taken as showing the true amount due the plaintiffs for work done to its date, unless the testimony clearly shows that the amount thereof was not due.

Answer: This point is denied. Under the contract, the final estimate shows the amount due, in the absence of fraud or palpable mistake.[4]

5. That the estimate of Mr. Finley, based not upon actual measurement, but on supposed cuttings, represented to him by Mr. Kiefer as having been claimed by Drhew & Bell, should not be permitted to overthrow the estimate of quantities, made by Mr. Seabrook and corroborated by Mr. Thompson, if they were made on actual measurements.

Answer: This point is denied; the testimony of Mr. Finley is for your consideration.[5]

6. By the terms of the contract the plaintiffs are entitled to 75 cents per cubic yard for rock excavation, and the jury must allow that price for all excavation denominated rock, whether the same be loose or solid.

Answer: This point is denied.[6]

6½. If, in the understanding of contractors for works of improvement, a single classification of rock includes loose rock and solid rock, then the plaintiffs are entitled to 75 cents per cubic yard for both classes and the estimate of Mr. Seabrook of December 15th, and that of Mr. Thompson of October, 1882, must be corrected in the value of the loose rock, so as to conform to the contract price of rock, viz.: 75 cents per cubic yard.

Answer: This point is denied.[6 1-2]

7. If the defendant failed to pay the plaintiffs the estimate of November 1, 1882, and the plaintiffs were thereby forced to stop the work, then the plaintiffs are entitled to recover damages for said breach, in addition to the amount that may be found due for work done.

Answer: This point is denied.[7]

8. The measure of damages sustained by plaintiffs is the profit they would have made on the work if they had been permitted to proceed with it till its completion.

Answer: This point is denied.[8]

9. If the court should decline the last point, then the plaintiffs are entitled to an allowance for the depreciation of the houses, wagons, implements and other items of their plant required for the prosecution of their work, so far as losses accrued from the defendant's breach.

Answer: This point is denied.[9]

10. If the work was done by the direction of the defendant's engineer, the plaintiffs are not responsible for defects, if any exist in the work, open to his inspection.

Answer: The plaintiffs are responsible for no defects of plan determined on by the city or its engineer, but they are responsible for defective work, or for defective material of the kind specified in their contract. They undertook to do all the work in a workmanlike manner, according to the plans and specifications. Even if through incompetency or dishonesty, the engineer estimated monthly defective work, and allowed for it,

the city can here show by proper evidence the defects and claim damages for it. The point is denied.[10]

The verdict was in favor of the plaintiffs for $6,940.83 damages. Judgment having been entered on the verdict, the plaintiffs took this writ, assigning as errors:

1–5. The answers to plaintiffs' points.[1 to 5]

6, 6½. The answers to plaintiffs' points.[6, 6 1-2]

7–10. The answers to plaintiffs' points.[7 to 10]

11. The portion of the charge: " This sum, $6,366.83, is all of the plaintiffs' claim that can be submitted to you, subject to the evidence of the defendant."

*Mr. N. P. Mervine* and *Mr. S. S. Blair*, for the plaintiffs in error:

1. The verdict established that the city was in default on the estimate of November 1, 1882, and by reason thereof plaintiffs were unable to proceed with the work; and it is further found that the city engineer on November 8th was requested by the plaintiffs to make a final estimate and decision, and that he refused. This refusal unquestionably opened the door of the court to the plaintiffs: Quigley v. DeHaas, 82 Pa. 274; Leebrick v. Lyter, 3 W. & S. 366. The treatment by the court of the estimate of December 15, 1882, made after the suit was brought, as conclusive, we submit was erroneous. The estimate then made stood on the footing of evidence, and not of adjudication. When the engineer refused to dispose of the case, when requested, his authority afterwards to adjudicate, except by the consent of the parties, was at an end.

2. Assuming however, for the sake of the argument, that the estimate of December 15th, was intended as an adjudication, it clearly appears that the engineer exceeded his authority in his estimate of rock excavation. The contract stipulated for but one classification. There had been but one classification in the fifteen estimates he had made. And when the bid was made for rock excavation, it must have been on the basis of whatever could fairly be called rock. The engineer had no power to fix another or different price or measure of compensation: Starkey v. Degraff, 22 Minn. 431; 2 Wood's Railway Law, 297; Lauman v. Young, 31 Pa. 306.

3. The plaintiffs had a contract to build a reservoir which might cost $60,000. It was impossible to say how much it would cost, and if presumptions are admissible, the contractors might well presume that the council would not expend money for pipes until they could get the water to put into them. Neither were they to be affected by appropriations made for other purposes: Gate v. Philadelphia, 14 W. N. 274; Allegheny County v. Gibson, 90 Pa. 408.

4. The plaintiffs were prevented from full performance by the default of the city. The council had expended all the fund on November 1, 1882, and plaintiffs found themselves with their plant on hand, useless for any other purpose. Why should they not have damages for the breach? Monongahela Nav. Co. v. Fenlon, 4 W. & S. 205; Phillips etc. Co. v. Seymour, 1 Otto 650; McGovern v. Bockius, 1 W. N. 517.

*Mr. Aug. S. Landis* (with him *Mr. A. V. Dively, City Solicitor*), for the defendant in error:

1. The testimony does not show that the engineer ever refused to make the final estimate. It shows that the council treated the plaintiffs as in default for stopping the work, and as having forfeited the 15 per cent retained. This being a legal question to be decided elsewhere, the engineer completed his duties by furnishing the estimate and ascertainment of the final balance. By this ascertainment, the plaintiffs were bound, and the court rightly instructed that they could not recover a greater sum, save that unpaid orders should be added: Monongahela Nav. Co. v. Fenlon, 4 W. & S. 205; Reynolds v. Caldwell, 51 Pa. 298; O'Reilly v. Kerns, 52 Pa. 214; Howard v. Railroad Co., 69 Pa. 489; Quigley v. DeHaas, 82 Pa. 267; Hartupee v. Pittsburgh, 97 Pa. 119.

2. There is no proof that the plaintiffs sustained any damage. They were as much bound to prove that damages were sustained as to prove the contract itself; the jury could not be asked to guess: Lentz v. Choteau, 42 Pa. 438; McKnight v. Ratcliff, 44 Pa. 159. Moreover, the city paid the contractors the last dollar in the treasury. It could pay no more: it was forbidden by law to borrow more money: Erie City's App., 91 Pa. 398. All persons contracting with a municipal corporation must at their peril inquire into the power of the corpora-

tion or its officers to make the contract, and a contract beyond the scope of the corporate power is void: 1 Dillon, Mun. C., ed. 1873, § 372.

OPINION, MR. JUSTICE CLARK:

This action of covenant is brought to recover the amount claimed to be due to Drhew & Bell, from the city of Altoona, upon a contract for the construction of a reservoir at Kittanning Point, for the supply of the city with water; and also for damages upon an alleged breach of the contract on the part of the city. The work was done under the terms of an agreement under seal, dated August 3, 1881; it was to be performed according to certain specifications set forth in the contract agreeably and subject to the directions of the city engineer, and be completed by the 31st August, 1882, to his satisfaction and acceptance. The location and general method of construction were defined by the contract, but changes and alterations therein were provided for as the engineer might determine, and the allowance or deduction consequent thereon was to be made by him; extra work was not to be compensated unless performed upon his order, and then according to his estimate of the value thereof; the work was to be performed with such force as the engineer should deem adequate to its completion within the time specified, and if the force in his opinion was inadequate, he had the right to employ additional force, pay for the same, and charge to the account of the contractor; for any omission or neglect in the requirements of the contract on the part of the contractors, the engineer had authority to forfeit their rights under it, and to stop the work at any time when in his opinion the best interests of the city required it. The city agreed to pay for the different kinds or classes of work at certain rates specified in the contract; the whole amount of the compensation thus depending upon the quantity of each kind of work, which should be actually performed. Although full specifications and plans were agreed upon, and working drawings prepared in advance, it was expressly provided, that the quantities exhibited to the contractors were necessarily only approximate; they furnished in the language of the contract itself "only general information, and will in no way govern or affect the final estimate, which will be made

out on the completion of the work, from actual measurements and established facts, not determinable at the time of letting the work." Provision was made for estimates of the work done, and for payment therefor, as follows, viz.: "On or about the last day of each month, during the progress of this work, an estimate shall be made of the relative value of the work done, to be judged of by the engineer, and eighty-five per cent of the amount of said estimate shall be paid to the party of the first part, on or about the first day of each month. And when all the work embraced in this contract is completed, agreeably to the specifications, and in accordance with the directions and to the satisfaction and acceptance of the engineer and city council, there shall be a final estimate made, of the quality, character, and value of said work, according to the terms of this agreement, when the balance appearing due to the said parties of the first part shall be paid to them, within thirty days thereafter." Every part of the work was to be executed "under the direction and subject to the approval of the engineer in charge," and it was understood, "that in all questions or matters relating thereto, or to the work, or the contract for the same, the decision of the engineer in charge shall be final and conclusive without appeal."

From these provisions of the contract it seems plain, that monthly estimates were required as mere approximations; they were to be made of the "relative value" of the work done; that is to say, the value was not absolute; it was the estimated value of a part, as it stood in connection with the whole. Each monthly estimate therefore bore relation to and was subordinate to the final one. The estimates were approximate, for, under the terms of the contract, it was only on the completion of the whole that the absolute amount of the compensation could be computed. The final estimate was to be made "when all the work embraced in the contract is completed," and it was agreed that an estimate should then be made of the quality, character, and value of said work, that is to say, of the whole work according to the terms of the agreement, when the balance appearing to be due shall be paid, etc.; this was the final estimate. It was to be made from actual measurements and established facts, which the parties agreed were not determinable at the time of the letting of the work, and in the

nature of the case were not determinable until its completion. The contractors were, however, entitled to be paid, during the progress of the work, according to these monthly estimates, and it cannot be doubted that when the city refused to pay the estimate No. 15, made November 1, 1882, a right of action accrued to the contractors, as against the city, for recovery of the amount. The value of the work as it progressed was a matter which, by the terms of the contract, was expressly submitted to the engineer; the estimate was his adjudication of it, and that was conclusive until the final estimate was made.

The work was commenced as agreed upon, but it was not completed within the period specified; no complaint is made that the work was unduly delayed; the engineer did not deem it necessary to employ additional force, and it is fair to presume that he deemed the force adequate; the delay, it is conceded, arose from the extent and difficulty of the work, beyond what had been anticipated. The reasons assigned for the refusal to pay were, first, that the work was not performed in a substantial and proper manner; this, however, was disposed of by the jury. And second, that the city had no money to pay it; that the $60,000 appropriated to this purpose was exhausted, and the city had no power under the constitution and laws of the state to provide further funds. Under these circumstances the contractors had an undoubted right to stop the work and they did stop it. They demanded the final estimate, which the engineer, at first, refused to make; it was not an absolute refusal, however; he refused until he would see what the city would decide to do. It may be, perhaps, that the contractors were not bound to await the engineer's convenience, or until he could see what the councils might determine in the matter, before bringing suit, for in some cases this might occasion the loss of the claim. That question is not raised on this record and we do not decide it.

The demand for a final estimate was properly addressed to the city; the engineer was the servant of the city, and it was the city's duty to have the final estimate made by the engineer. If upon demand this was not done with reasonable dispatch, the plaintiffs were entitled to their action and to prove the value of their work otherwise: McMahon v. N. Y. & Erie R.

Co., 20 N. Y. 463; Herrick v. Belknap, 27 Vt. 673. But we are clearly of opinion that there was not a refusal, in such terms and for such length of time, under the circumstances, as would oust the jurisdiction of the engineer, in the adjustment of the matters involved in the contract. There was no absolute refusal, on the part of the engineer, to perform his duty under the agreement; he was to make monthly estimates, and having made one on the 1st November covering the work in October, he might, on a sudden stoppage of the work, well hesitate in making another, a few days thereafter, until he could ascertain whether the plaintiffs were justified in their action, and whether a final estimate was of right due to them; his duty did not require him to make a final estimate until it appeared to him either that the work was completed or that the contractors were justified in abandoning it. Under the conceded facts of the case we fail to find any evidence which would justify an inference by the jury that the engineer refused to perform his duty. On the trial, however, it was shown that he did make a final estimate; it does not appear when he commenced the work, but it does appear that it was completed and submitted to councils, for the inspection of the parties, on the 15th of December, 1882. This estimate, so far as it falls, within the scope of the submission, is to be treated, not as evidence merely, but as an adjudication under the contract and therefore " final, conclusive, and binding on all parties."

But the engineer's estimate is an adjudication, which is conclusive only upon the condition that it is made according to the terms of the submission; it was not in his power to change the contract so as to allow either a greater or a less rate of compensation than was plainly agreed upon. In order to oust the jurisdiction of the courts, it must clearly appear that the subject-matter of the controversy was within the prospective submission; the right of trial by jury is not to be taken away by implication: Lauman v. Young, 31 Pa. 306. The contract of the parties was that the final estimate should be made "of the quality, character, and value of said work, according to the terms of this agreement," etc., and that "any disagreement or difference between the city and the contractors upon any matter or thing arising from these specifications or drawings to

which they refer, or to the contract for the work, or the kind
or quality of the work required thereby, shall be decided by the
engineer in charge, whose decision and interpretation of the
same shall be considered final, conclusive, and binding on all
parties." The plaintiffs were to receive for earth excavation
$.35 per cubic yard, and for rock excavations $.75 cents per
cubic yard; in the final estimate, the engineer allowed for—

18,063.4 cubic yards of earth excavation at $.35 . . . . . . . $6,322.33
14,379.1 cubic yards of loose rock excavation at $.50 . . . . . 7,389.55
5201.6 cubic yards of solid rock excavation at $.75 . . . . . . 3,901.20
2701.6 cubic yards of above, extra pay for picking, at $.55 . . 1.485.88

The engineer introduced a new term in the contract; the
character of excavation, provided for in the contract, and for
which the price was specified, was either earth or rock ; there
was no distinction made as to the kind of rock, whether loose
or solid ; nor was there any engagement to accept $.50 per cubic
foot for any kind of rock excavation. It is reasonable to sup-
pose that the bids were made, and the contract closed, upon the
general terms of the specifications, and that $.75, the price
agreed upon for rock excavation, was the medial or average
value of the excavation of all the divers qualities of what was
properly called rock, encountered in the progress of the work.
The estimate clearly exhibits the fact that loose rock could not
be regarded as earth, for it is set down as loose rock; a differ-
ent value is allowed for it, and extra pay for picking. Any
disagreement arising out of the specifications or drawings, as
to the kind or quality of the work required thereby or by the
contract, it is true, was to be decided by the engineer, whose
decision and interpretation of the same was to be conclusive ;
but it must be conceded that the engineer had no power over
the express agreement of the parties, the terms of which were
wholly undisputed. There was no evidence of fraud, accident,
or mistake through which anything was omitted from the con-
tract; the contract required no interpretation; its terms were
fully and clearly expressed and its meaning open and obvious.
The engineer simply set aside the agreement of the parties and
made a new one ; he determined not what the contract was,
but rather what he thought it ought to be. In such a case the
estimates cannot be considered conclusive : McAvoy v. Long,

13 Ill. 147; Alton R. Co. v. Northcott, 15 Ill. 49; Galveston, etc., R. Co. v. Henry, 29 Am. & Eng. R. Cases, 265. This action of the engineer was clearly ultra vires, and to that extent the estimate can have no binding force. But an award may be good in part and in part bad. In such case it is void pro tanto only: South v. South, 70 Pa. 195; and the same principle must apply in the case of a prospective submission to an engineer, as under the contract in suit. We are of opinion that the court erred in holding the engineer's estimate to be conclusive in so far as he undertakes to insert in the contract terms upon which the parties never agreed, and that in this respect the estimate is bad.

The plaintiffs further contend that having been forced to stop the work on account of the failure and legal inability on the part of the city to pay, they are entitled to recover not only the balance due on the contract when the work was stopped, but also such damages as they have sustained in consequence thereof from the depreciation of their property, and of the machinery used or material employed in the work, from loss of profits, etc. The defendant's reply to this, that the fund of $60,000, raised by loan and specifically appropriated to the building of the reservoir, and for the purchase and laying of water-pipes, has been exhausted; that the city indebtedness already exceeds the constitutional limit, and if there could be a recovery of damages in such a case as this, the constitutional restriction for the protection of the citizens would be practically abrogated, for the liability in damages on the breach of the contract would be likely to produce the same results which came formerly from its legal enforcement, and that result it was the purpose of the constitutional provision to prevent.

The learned judge of the court below on this branch of the case instructed the jury as follows: "We further instruct you that they were bound to assume, when they undertook the contract, that such a contingency might happen at any time during the progress of the work; that they might get notice that the fund was exhausted; and they cannot here recover for any loss which they were bound to assume might happen without any illegal act or wrong whatever, and which could only be prevented by raising money illegally. They can recover no damages arising from the sacrifice or depreciation of materials

or implements, and nothing for profits which they might have made had they completed the work; and such seems to have been the view of the parties at the time they made this contract, for it is stipulated that the engineer in charge shall have the right to cause a stoppage of the work at any time, when in his opinion, the best interest of the city shall require it. The engineer did not stop the work but the city did, by notifying the contractors that there was no more money with which to go on." The court, therefore, instructed the jury that the plaintiffs were entitled to be paid what was due to them, under the contract, up to the time when they had notice the fund was exhausted, which was on the 7th or 8th of November, when they presented their order to Mr. Lloyd.

We are not called upon to decide as to the accuracy of this instruction in every aspect of the case, nor do we pass upon it. If the fund of $60,000 was really exhausted, and the city's condition was as stated, this instruction of the court was certainly as favorable to the plaintiffs as they had any right to expect. It is said, however, that the $60,000 was not all expended for the purposes to which by the ordinance it was specifically appropriated; that the money was misapplied, and that to the extent of the fund that is misapplied, the plaintiffs may recover, if they establish a valid claim. It is contended that the $60,000 was not legally applicable to the purchase of the water-pipes under the previous ordinance of councils. We do not think so. The ordinance of August, 1880, provided for the purchase of the pipe, not for payment. The fund of $60,000 was brought into the treasury for this express purpose; this money was to be "used for the building of reservoirs for the storage of water for the use of said city, and for the purchase and laying of water-pipes throughout the city, and for that purpose only." Although this action of the mayor and councils was prior to the raising of the money, it does not appear that any pipe was delivered, or any actually contracted for until the means of payment had been provided by the loan of $60,000. Now if we take the amount already received by the plaintiffs from this fund on the several monthly estimates, and add to that the amount expended in the purchase of pipes and in putting them in place, and deduct that sum from $60,000, the difference will exhibit the amount remaining. If

the jury in their consideration of this case shall find the sum due to the plaintiffs for work done under contract, including the unpaid orders, equal to or greater than this difference, it is plain that the plaintiffs cannot recover damages in addition, for this would be doing by indirection what the law would not permit to be done directly.

For the reasons stated the first, second, third, fourth, fifth, seventh, eighth, ninth, tenth, and eleventh assignments are dismissed, but the assignments numbered six and six and one half are sustained, and on them

The judgment is reversed, and a venire facias de novo is awarded.